UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KEVIN J. JOHNSON,

                              Plaintiff,

                                                    9:12-CV-0210
v.                                                  (DNH/TWD)

BRIAN FISCHER, HAROLD H. GRAHAM,

                                        Defendants.
_____

APPEARANCES:                          OF COUNSEL:

KEVIN J. JOHNSON, 98-B-0132
Plaintiff pro se
Wyoming Correctional Facility
P.O. Box 501
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN              CATHY Y. SHEEHAN, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

        This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Kevin J.

Johnson claims that he was exposed to dangerously high levels of tobacco smoke, bird feces, and

mold at Auburn Correctional Facility.  Currently pending before the Court is Defendants' motion

for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 82.)  For the

reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment.

## I.    FACTUAL AND PROCEDURAL SUMMARY

### A.    Smoking Issue

In the operative complaint, Plaintiff alleges that he has been exposed to dangerously high levels of cigarette and other tobacco smoke for "several years" at Auburn Correctional Facility. (Dkt. No. 38 at 2.)  A policy applicable to all facilities within the New York Department of Corrections and Community Supervision ("DOCCS") prohibits all indoor smoking.  (Dkt. No. 82-4 ¶ 7.)  Under the policy, smoking is permitted only in recreation yards.  *Id*.  Despite the policy, Plaintiff alleges that officers, inmates, and civilian staff all smoke, creating a "network of smokers that stick together [so] there is nothing being done to stop indoor smoking."  (Dkt. No. 38 at 2.)  Plaintiff alleges that he "constantly encounter[ed] clouds of smoke in just about every building in [the] facility," including the industry building, the cell block area, and the school building.  *Id*. at 3.

Plaintiff alleges that Defendant Harold D. Graham, the superintendent of Auburn, "can not claim that he is unaware of the disregard for the no smoking indoors policy" because there are cigarette butts and ashes on the floor.  (Dkt. No. 38 at 3.)  At his deposition, Plaintiff testified that "it would be impossible for [Defendant Graham] to walk through . . . the . . . building and walk in one of those bathrooms and not know that smoking is going on."  (Dkt. No. 82-9 at 38:20-23.[1])  However, Plaintiff admitted that he had no first-hand knowledge of Defendant

---

[1]    Page numbers in citations to Plaintiff's deposition transcript refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Graham seeing an inmate smoke in the facility.  *Id*. at 38:24-39:4.  Plaintiff also admitted at his

deposition that he had never seen Defendant Graham in the presence of a smoking employee.  *Id*.

at 39:5-14.  In a declaration filed in opposition to the motion for summary judgment, Plaintiff

declares that, since the time of his deposition, he has personally witnessed Defendant Graham in

the presence of a smoking officer.  (Dkt. No. 89 at 31.[2])

Plaintiff alleges that he filed a grievance regarding the smoking issue and appealed the

grievance to Defendant Graham.  (Dkt. No. 38 at 3.)  A document signed by Plaintiff, dated June

18, 2010, and addressed to Defendant Graham states that:

> I am writing this letter to you as an appeal of the above numbered
> grievance that I filed.  I am forced to appeal in this manner because
> I was not afforded the hearing that I am entitled to, by policy and law.
> However I understand this issue is a touchy subject, but yet it's a very
> serious problem.
>
> I have addressed this issue, because I do have reason to worry about
> the fact that everyday I am being exposed to high amounts of second
> hand smoke.  Mainly by the inmates who smoke, but I can not impose
> any sanctions against the inmates that smoke, and since there are
> policies that prohibit inmates from smoking inside the staff, mainly
> Corrections Officers are supposed to enforce these policies, but the
> Officer[]s don't enforce them because they too smoke.  Which puts
> people like myself that don't smoke health at risk, from the exposure
> to second hand smoke inhalation.
>
> I am asking that you consider my recommendation that was made in
> my grievance, and or come up with some kind of solution to this
> problem.  Because as long as this problem is ignored and continues
> to happen myself, and others in the same situation . . . are being put
> at risk.

(Dkt. No. 89 at 33.)

---

[2]     Page numbers in citations to Plaintiff's opposition to the motion for summary
judgment refer to the page numbers assigned by the Court's electronic filing system.

Plaintiff alleges that Defendant Graham issued "a detailed response." (Dkt. No. 38 at 3.) The Superintendent level response to the grievance states:

> The grievant should address concerns regarding staff smoking to a supervisor and inmates smoking to area staff, at that time, to allow for remedial action to be taken. Appeal granted to that extent.

(Dkt. No. 89 at 32.)

Plaintiff alleges that he appealed Defendant Graham's decision to the Central Office Review Committee ("CORC") in Albany. (Dkt. No. 38 at 3.) Plaintiff's appeal statement said that "I should not be required to police the staff and or inmates, not to mention the potential for harm to my person for retaliation." (Dkt. No. 89 at 32.) The record does not include CORC's response to Plaintiff's grievance regarding smoking.

Plaintiff alleges that Defendant Brian Fischer, who at all relevant times was the Commissioner of DOCCS, is a "member of the Review Committee of CORC, which has reviewed and denied [Plaintiff's] grievance." (Dkt. No. 38 at 3.) Plaintiff further alleges that the CORC office "is located in the same office as" Defendant Fischer. *Id.* Plaintiff further alleges that "through prior reports, suits, and grievances [Defendant Fischer] is aware of the action[s] of his subordinates and refused to do anything about it; which constitutes a gross neglect in managing his subordinates." *Id.*

Defendant Fischer declares that "there is no indication in the files that I ever personally read or responded" to any letter from Plaintiff and that he has "no recollection of ever having done so." (Dkt. No. 82-7 ¶ 6.) Defendant Fischer declares that DOCCS' no-smoking policy was implemented during a predecessor's tenure as Commissioner. *Id.* ¶ 8. He declares that:

> the day-to-day oversight of each of the Department's correctional facilities is carried out by the Superintendent of his/her respective

> correctional facility. This day-to-day oversight included the implementation of the DOCCS smoking policy. To my knowledge and belief, each Superintendent . . . was properly implementing the DOCCS smoking policy within their respective correctional facility. This includes Auburn Correctional Facility.

*Id*. ¶ 9.

Brian D. Chuttey, a Captain at Auburn, has filed a declaration in support of Defendants' motion for summary judgment. (Dkt. No. 82-4.) He declares that 206 inmates were disciplined for smoking indoors at Auburn between January 1, 2009, and January 1, 2012. *Id*. ¶ 9. Captain Chuttey's declaration does not include any information about enforcement of the smoking policy on staff.

Plaintiff has filed declarations from two other inmates regarding smoking. (Dkt. No. 89 at 26; 29.) Inmate Juan Smith declares that he smoked for the entire time he was housed at Auburn, in both the cell blocks and the industry building. (Dkt. No. 89 at 26.) He declares that officers allowed him to smoke in the shop and in the restroom. *Id*. He states that neither he nor anyone he knows has ever been "locked up" for smoking indoors. *Id*. Inmate Keith Todd declares that during his eight years at Auburn he observed "many inmates" and correction officers smoking inside. (Dkt. No. 89 at 29.) He declares that he has never known anyone who was punished for smoking in a cell or in the industry building. *Id*. He declares that the no smoking policy is not being enforced. *Id*.

## B. Bird Feces and Mold Issue

Plaintiff alleges that beginning on July 31, 2011, he was housed in a cell on the ground floor of the facility. (Dkt. No. 38 at 4.) Plaintiff alleges that his cell was ten feet away and directly across from the heating system, which was covered in bird feces. *Id*. Plaintiff alleges

that the wire gates of the upper tiers were covered in mold.  *Id.*  Plaintiff attempted to clean those areas himself.  *Id.*

Plaintiff, who is a diabetic, alleges that he researched the issue and learned that feces and mold are particularly toxic to diabetics.  (Dkt. No. 38 at 4.)  Accordingly, Plaintiff filed a grievance.  *Id.*  The Inmate Grievance Resolution Committee's report stated that "[i]t is recommended that this matter be addressed further.  The issue with the 'chicken wire' fencing and the built up dirt, bird feces, etc has been an issue for a while."  (Dkt. No. 89 at 25.)  Plaintiff alleges that Defendant Graham issued a detailed ruling.  (Dkt. No. 38 at 4.)  Plaintiff alleges that he then "appealed his grievance to CORC [where] Fischer based on information and belief is a committee member."  *Id.*  In an unsigned decision dated November 30, 2011, CORC unanimously accepted Plaintiff's grievance in part.  The decision stated:

> Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.  CORC upholds the discretion of the facility administration to determine the necessity of cleaning outside fencing or bars . . . CORC advises grievant . . . to address copies or the status of his grievances to the IGP Supervisor.

(Dkt. No. 89 at 23.)

Thereafter, the facility attempted to clean the area.  (Dkt. No. 38 at 4.)  Plaintiff alleges that:

> the unskilled clean up attempts are proving to create a greater hazard: the [f]eces is being washed down into the heating element cover, and soaked into the heating element which is releasing it into the air with the heat, and the [m]old was dry brushed off of the wire fencing sending a shower of [m]old spores into the air, not to mention the mold that's covering the walls, and the [a]ir [c]irculating unit covers, that's actually blowing [m]old spores around every time it's turned on.

6

*Id.*

Plaintiff alleges that on August 2, 2011, Defendant Fischer's office rescinded the policies governing proper cleanup of bird feces and had the directives governing cleanup removed from the files at Auburn. (Dkt. No. 38 at 4-5.) Plaintiff alleges that "[b]y doing this Fischer has made it possible for the improper cleaning practices to be used and continued." *Id.* at 5. At Plaintiff's deposition, he identified the document that he alleged contained the rescission. (Dkt. No. 82-9 at 46:24-47:4.) That document was read into the record. It stated "please remove and destroy the following policies from your files: A-0A-03-06-A, cleanup of bird/bat feces. Comment: Proper cleaning procedures covered in directive 309045064 and 2121." *Id.* at 47:5-10.

Plaintiff has filed declarations from two inmates regarding the bird feces and mold. (Dkt. No. 89 at 27-28, 30.) Inmate Darryl L. Freeman declares that he never, in the eight years he was housed at Auburn, observed anyone clean the bird feces on a daily, weekly, or monthly basis. (Dkt. No. 89 at 27.) He declares that in his "thirty-three years in the State Prison system, [I] have never witnessed anything like the bird feces problem in Auburn Correctional Facility." *Id.* Inmate Eddie Badia declares that when he moved into Plaintiff's cell block in July 2011, the heating element cover along the entire wall in the cell area was covered in bird feces, as well as the wire fencing on the outer bars of the upper cell levels. (Dkt. No. 89 at 30.) He declares that the walls, windows, and covers for the exhaust fan units are covered in mold spores. *Id.* He declares that this "is still an on going issue that needs to be addressed." *Id.*

Captain Chuttey declares that Plaintiff's cell block "is cleaned every day by inmates who are provided with the appropriate cleaning supplies that are delivered to the Block every day." (Dkt. No. 82-4 ¶ 15.) Regarding the wire fencing specifically, Captain Chuttey declares that "I

do not remember bird feces or mold ever being on the chain link fencing. Nevertheless, efforts have always been made to keep this area clean. Because of the height of the fencing, scaffolding is required to clean this area." *Id*. ¶ 16.

### C. Facts Regarding Plaintiff's Medical Condition

Plaintiff alleges that exposure to smoke, mold, and feces has caused him constant chest congestion, trouble breathing at night, allergies, nasal problems, persistent cold like symptoms, and heavy yellowish mucus in his throat in the mornings. (Dkt. No. 38 at 5.) Plaintiff alleges that the "need for clean indoor air is well known . . . however the [staff] here still continue to smoke indoors improper clean up attempts of the [b]ird [f]eces and [m]old has truly created a gr[e]ater health hazard." *Id*.

Mary C. Coryer, RN, the Nurse Administrator at Auburn, has filed a declaration in support of Defendants' motion for summary judgment. (Dkt. No. 82-3.) This declaration is based upon her review of Plaintiff's "medical records shown to me by my counsel in this action." *Id*. ¶ 4. She declares that "Plaintiff's medical records reveal that Plaintiff was seen on several occasions between March 2009 and October 2012, however, there is no indication in his medical record that he made any complaints concerning the issues raised in this lawsuit: second-hand smoke . . . or bird feces and mold." (Dkt. No. 82-3 ¶ 5.) She further declares that "[d]uring the period in question, Plaintiff did not complain of a constant cough, constant cold and flu like symptoms, constant chest congestion, constant runny nose, constant shortness of breath, constant pulmonary and respiratory problems, vomiting, and confusion." *Id*. ¶ 6. She declares that "there is nothing in the medical records attached that would suggest Plaintiff is experiencing signs or symptoms of being exposed to [smoke] or bird feces and mold." *Id*. ¶ 7.

Defendants have submitted Plaintiff's medical records. (Dkt. No. 83.) The admissibility of these documents is supported by the affidavit of the keeper of records at Auburn. *Id*. at 2; Fed. R. Evid. 803(6). However, as Plaintiff correctly notes (Dkt. No. 89 at 4), these medical records include at least some documents regarding a different Kevin Johnson. For example, progress notes dated October 27, 2010, and October 29, 2010, are for a Kevin Johnson with a prison identification number of 93-A-2751. (Dkt. No. 83 at 40.[3]) Plaintiff's identification number is 98-B-0132. *Id*. at 2.

In addition to this potential problem with the accuracy of the records, the records themselves do no entirely support Nurse Coryer's declaration. Although the word "constant" is not used, the records include several examples of Plaintiff complaining about respiratory symptoms. A progress note dated December 14, 2010, indicates that cough syrup was provided to Plaintiff. (Dkt. No. 83 at 38.) A progress note dated August 23, 2011, indicates that Plaintiff complained of coughing and sneezing. *Id*. at 30. A progress note dated November 18, 2011, indicates that Plaintiff complained of blockage in both ears and a sore throat. *Id*. at 27. A progress note dated February 7, 2012, indicates that Plaintiff complained of a cold and sinus congestion and about sniffling. *Id*. at 25. A progress note dated February 16, 2012, indicates that Plaintiff complained of head cold symptoms. *Id*. at 24. A progress note dated May 1, 2012, indicates that Plaintiff complained of head cold symptoms and nasal congestion. *Id*. at 22.

On August 8, 2012, Plaintiff wrote to the Nurse Administrator to complain about lack of proper medical treatment. (Dkt. No. 89 at 20.) Plaintiff complained that he was coughing up a

---

[3]      Page numbers in citations to the medical records refer to the page numbers assigned by the Court's electronic filing system.

thick yellowish mucus and was suffering from chest congestion. *Id.* He also complained about

bumps on the back of his head that were itching, bleeding, and burning. *Id.* He was concerned

about the bleeding because, as a diabetic, "any type of sores and or bleeding is very dangerous for

me." *Id.* He stated that he believed that both the chest congestion and the bumps on his head had

been caused by exposure to bird feces. *Id.* The Nurse Administrator replied on August 10, 2012,

that Plaintiff had been scheduled to see a doctor on August 13, 2012. *Id.* at 21. Progress notes

show that Plaintiff actually saw the doctor on August 10, 2012, regarding the bumps on his head.

(Dkt. No. 83 at 19.) Plaintiff was "instructed on care" and a follow up appointment was

scheduled for August 13, 2012. *Id.* Plaintiff was seen as scheduled on August 13, 2012. *Id.* at

18.

A progress note dated October 30, 2012, indicates that Plaintiff was seen regarding a

burn. (Dkt. No. 83 at 13.) At that time, he also complained of nasal congestion. *Id.*

### D.     Procedural History

Plaintiff filed the original complaint in this action on January 31, 2012. (Dkt. No. 1.)

Plaintiff filed an amended complaint on April 30, 2012. (Dkt. No. 11.) Defendants moved to

dismiss the amended complaint, arguing that Plaintiff had not sufficiently alleged their personal

involvement. (Dkt. Nos. 20 and 31.) The Court granted the motion as to Defendant Fischer,

giving Plaintiff leave to amend to allege facts plausibly suggesting Defendant Fischer's personal

involvement. (Dkt. Nos. 35 and 37.) The Court denied the motion as to Defendant Graham. *Id.*

Plaintiff filed a second amended complaint on December 14, 2012. (Dkt. No. 38.) The Court

accepted the second amended complaint for filing and directed Defendants to respond. (Dkt. No.

39.) Defendants answered the second amended complaint. (Dkt. No. 40.) The parties proceeded

to discovery.

Defendants now move for summary judgment. (Dkt. Nos. 82 and 83.) Plaintiff has opposed the motion. (Dkt. No. 89.) Defendants have filed a reply. (Dkt. No. 90.)

## II.   LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 & n.11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

---

[4]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

## III. ANALYSIS

Defendants argue that they are entitled to summary judgment because (1) Plaintiff cannot establish that they were personally involved in any alleged constitutional violations; and (2) Plaintiff cannot establish any Eighth Amendment violation.  (Dkt. No. 82-10.)  For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment.

### A. Personal Involvement

#### 1. Defendant Fischer

Defendants argue that Plaintiff cannot establish that Defendant Fischer was personally involved in the alleged constitutional violations.  (Dkt. No. 82-10 at 4-6.[5])  Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.  *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210

---

[5]     Page numbers in citations to Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

12

(2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).[6]

Regarding the smoking issues, Plaintiff has not raised a triable issue of fact that Defendant Fischer was personally involved. Although Defendant Fischer's declaration does not explicitly state that he was not on the CORC panel that reviewed Plaintiff's grievance, there is no evidence in the record that Defendant Fischer reviewed Plaintiff's grievances about the smoking issue or that he was made aware of the alleged violations of the smoking policy. As noted above, the CORC decision is unsigned. Plaintiff's mere belief that Defendant Fischer reviewed his grievances is insufficient to establish Defendant Fischer's personal involvement. *See Patterson*

---

[6] In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*." *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2012). The Second Circuit declined to address the issue in *Reynolds*, however, and has not addressed it since that time. I will assume for the purposes of this motion that *Colon* remains good law.

*v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988); *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993). Therefore, I recommend that the Court dismiss the claim regarding smoking against Defendant Fischer for lack of personal involvement.

Likewise, regarding the bird feces and mold issue, Plaintiff has not raised a triable issue of fact that Defendant Fischer was personally involved. As with the smoking issue, there is no evidence in the record that Defendant Fischer reviewed Plaintiff's grievances about bird feces and mold. Further, there is no evidence in the record that he was personally involved in rescinding the policy regarding cleaning procedures. Therefore, I recommend that the Court grant Defendant's motion for summary judgment and dismiss the action against Defendant Fischer for lack of personal involvement.[7]

### 2. Defendant Graham

Defendants argue that Defendant Graham was not personally involved in the alleged constitutional violations. (Dkt. No. 82-10 at 4-6.) Defendants argue that Plaintiff "admits he never communicated" with either Defendant about either the smoking issues or the bird feces and mold. (Dkt. No. 82-10 at 5.) However, as discussed above, Plaintiff alleges, and the evidence shows, that Defendant Graham responded to Plaintiff's grievances about both issues. Defendants have not addressed that fact.

---

[7] Even if Defendant Fischer were personally involved, he would be entitled to summary judgment because, as discussed below, Plaintiff has not raised a triable issue of fact that his Eighth Amendment rights were violated.

The Second Circuit has noted in dicta that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). District courts in the Second Circuit have struggled to answer this question. *See Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y 2009) (collecting cases). The *Burton* court noted that district courts have found personal involvement based on denying a grievance where (1) the superintendent undertakes some kind of investigation into the initial denial; (2) the superintendent provides a detailed and specific response to the grievance rather than a pro forma denial; or (3) the grievance involves an ongoing violation "such that the 'supervisory official who reviews the grievance can remedy it directly.'" *Id*. (quoting *Vega v. Artus*, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009)) (punctuation omitted).

Here, Defendant Graham issued responses to Plaintiff's grievances that, although not lengthy, were more than simply pro forma denials. (Dkt. No. 89 at 32; Dkt. No. 38 at 4.) Moreover, Plaintiff's grievances involved ongoing issues that Defendant Graham could have remedied directly. Therefore, Plaintiff has raised a triable issue of fact that Defendant Graham was personally involved in the alleged constitutional violations.

## B. Eighth Amendment

Plaintiff alleges that Defendants violated the Eighth Amendment by exposing him to smoke, bird feces, and mold. (Dkt. No. 38.) The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials "must 'take reasonable measures to guarantee the safety of the inmates.'" *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To establish an Eighth Amendment conditions of confinement claim, a plaintiff must

prove both an objective and a subjective component. *Id*. at 834. Defendants argue that they are entitled to summary judgment. (Dkt. No. 82-10 at 6-7.) Defendants are correct.

       1.   <u>Smoking</u>

Plaintiff claims that Defendants violated his Eighth Amendment rights by exposing him to environmental tobacco smoke ("ETS"). (Dkt. No. 38.) Eighth Amendment jurisprudence on the subject of prison ETS claims distinguishes between claims of present harm from ETS exposure (such as where exposure to ETS creates or exacerbates a medical condition) and claims that ETS exposure will cause the prisoner harm in the future. *See, e.g., Davidson v. Coughlin*, 920 F. Supp. 305 (N.D.N.Y. 1996). The Court will analyze the present claims and future claims separately.

       a.   *Present Claims*

ETS claims of present harm are analyzed, like other Eighth Amendment medical claims, pursuant to the framework set out in *Estelle v. Gamble*, 429 U.S. 97 (1976). In order to establish the objective prong, a plaintiff must show that ETS caused him to suffer serious adverse health consequences or that ETS aggravated an existing medical condition. *Liggins v. Parker*, No. 9:04-CV-0966 (NAM/DEP), 2007 U.S. Dist. LEXIS 98713, at *49, 2007 WL 2815630, at * 16 (N.D.N.Y. Sept. 25, 2007[8]) (citing *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001)).[9]

Defendants argue that "Plaintiff does not suffer from any symptoms due to exposure to

---

      [8]     Lexis and Westlaw list different dates for this decision. The Court has used the date listed by Westlaw, which reflects the date on which the Court adopted the magistrate judge's report and recommendation.

      [9]     The Court will provide Plaintiff with a copy of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

ETS . . . and, therefore, he cannot establish the first element. Plaintiff claims that the following symptoms are indicative or exposure to ETS . . . : confusion; vomiting; constant cold and flu like symptoms; shortness of breath; pulmonary and respiratory problems; constant chest congestion; constant cough; and constant runny nose." (Dkt. No. 82-10 at 6, citing Dkt. No. 82-9 at 10:11-15:9.) Defendants are correct.

Medical conditions such as breathing problems, chest pains, dizziness, sinus problems, headaches, and loss of energy are "relatively minor" and are not sufficiently severe to establish the objective prong of an Eighth Amendment claim for present exposure to ETS. *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999); *see also Liggins*, 2007 WL 2815630, at *16 (one complaint of shortness of breath, with no underlying diagnosis of asthma or similar condition, insufficient to establish objective element of an ETS present-injury claim). Here, Plaintiff's medical records reflect only minor respiratory symptoms. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims regarding present harm from exposure to ETS.

b.    *Future Claims*

In order to succeed on an ETS claim alleging future harm, a plaintiff must establish both an objective and a subjective element. *Gill v. Smith*, 283 F. Supp. 2d 763, 766 (N.D.N.Y. 2003). To establish the objective element, the plaintiff must show that he was exposed to unreasonably high levels of ETS. *Helling v. McKinney,* 509 U.S. 25, 35 (1993); *Gill*, 283 F. Supp. 2d at 766. Determining whether a plaintiff was exposed to unreasonably high levels of ETS

> requires more than scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner

> complains of to be so grave that it violates contemporary standards of
> decency to expose *anyone* unwillingly to such a risk. In other words,
> the prisoner must show that the risk of which he complains is not one
> that today's society chooses to tolerate.

*Helling*, 509 U.S. at 36. As this quote indicates, in contrast to a claim of present harm from ETS,

the focus in a claim of future harm from ETS is *not* on whether the plaintiff has sought treatment

or complained of ailments associated with exposure to ETS. *McPherson v. Coombe*, 29 F. Supp.

2d 141, 145-46 (W.D.N.Y. 1998). Rather, the objective element for a claim regarding future

harm from ETS focuses on whether levels of ETS in the facility were so high that they violated

contemporary standards of decency.

A review of cases in which prisoners' claims regarding future harm from ETS survived

summary judgment demonstrates the type of egregious facts necessary to raise a genuine issue of

material fact. For example, in *Warren v. Keane*, 937 F. Supp. 301, 303 (S.D.N.Y. 1996), the

court denied the defendants' motion for summary judgment where the evidence showed that

smoke in the poorly-ventilated facility was so thick that the plaintiffs had to hold wet

handkerchiefs over their noses and mouths while in common areas such as the chapel,

auditorium, gym and recreational area. In *McPherson,* the court denied the defendants' motion

for summary judgment because the evidence showed that the plaintiff could not access the

prison's day room due to the thick smoke, had to pass through the day room to reach the

bathroom, and was housed in poorly ventilated and heavily populated units (first with forty-one

other prisoners and then with ninety other prisoners) where smoking was allowed. In *Gill v.

Smith*, 283 F. Supp. 2d 763 (N.D.N.Y. 2003), the court denied the defendants' motion for

summary judgment where, viewing the facts in the light most favorable to the plaintiff, the

evidence showed that the asthmatic plaintiff was forced to spend a substantial part of each day in

a room with a prison employee who smoked constantly.

Cases without such egregious facts have not survived summary judgment. For example, in *Davidson v. Coughlin*, 920 F. Supp. 305, 309 (N.D.N.Y. 1996), the court granted summary judgment for the defendants where the plaintiff, who was single-celled, failed to demonstrate "what the level of smoke in the facility was or whether that degree of exposure would have been serious enough to cause or aggravate a current or future serious illness." In *Liggins*, the court granted summary judgment for the defendants where the evidence showed only that the plaintiff "was subjected to second hand smoke at the hands of fellow inmates as well as jail workers" and that prisoners' smoking habits were encouraged by jail officials. *Liggins*, 2007 WL 2815630, at *4, 17. The court deemed this cursory evidence insufficient to "describe conditions which rise to a level which today's society chooses not to tolerate." *Id.*

Here, the conditions Plaintiff describes are not egregious enough to "describe conditions which rise to a level which today's society chooses not to tolerate." *Liggins*, 2007 WL 2815630, at *17. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claim regarding future harm from ETS.

> 2.    Bird Feces and Mold

Plaintiff claims that Defendants violated the Eighth Amendment by exposing him to bird feces and mold. (Dkt. No. 38 at 4.) Defendants move for summary judgment of this claim. (Dkt. No. 82-10 at 6-7.)

To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, a prisoner must show that the defendant's "act or omission . . . result[ed] in

the denial of the minimal civilized measure of life's necessities." *Id*. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The parties have not cited, and the Court cannot find, any Eighth Amendment cases dealing specifically with exposure to bird feces. Analogizing to cases involving exposure to human feces, the Court finds that Plaintiff has not raised a triable issue of fact regarding the objective component of his Eighth Amendment claim.

In *Gaston v. Coughlin*, 249 F.3d 156 (2d Cir. 2001), the Second Circuit reversed a summary judgment entered in the defendants' favor where a prisoner presented evidence that the area directly in front of his cell was "filled" with human feces, urine, and sewage water for several consecutive days. The Second Circuit stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end." *Id*. at 166. Other courts considering protracted exposures to feces or sewage have similarly allowed the claims to proceed to trial. *See Willey v. Kirkpatrick*, No. 07-CV-6484 (MAT), 2013 U.S. Dist. LEXIS 14935, at *20-23, 2013 WL 434188, at *8 (W.D.N.Y. Feb. 4, 2013) (collecting cases).[10] Where the exposure is not protracted, courts are split as to whether the prisoner has presented a triable Eighth Amendment claim. *Id*., 2013 WL 434188, at *9 (collecting cases). Where claims in shorter-duration cases have survived dispositive motions, they have involved appalling conditions such as a "feces-covered cell," a "waste-filled cell," or a cell with no working toilet.

---

[10]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

*Id*.

Here, even viewed in the light most favorable to Plaintiff, the alleged feces and mold conditions at Auburn do not rise to the level described in *Gaston*. The evidence shows merely that Plaintiff was housed ten feet away from a heating system covered in bird feces and that there was a buildup of feces and mold on chain link fencing so high over Plaintiff's cell that it could only be accessed with scaffolding. (Dkt. No. 38 at 4; Dkt. No. 82-4 ¶ 15; Dkt. No. 89 at 27, 30.) These conditions do not compare, objectively, to the feces-filled environments to which the plaintiffs in cases that survived summary judgment were exposed. Therefore, I recommend that the Court grant Defendants' motion for summary judgment.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 82) be **<u>GRANTED</u>**; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Liggins v. Parker*, No. 9:04-CV-0966 (NAM/DEP), 2007 U.S. Dist. LEXIS 98713, 2007 WL 2815630 (N.D.N.Y. Sept. 25, 2007) and *Willey v. Kirkpatrick*, No. 07-CV-6484 (MAT), 2013 U.S. Dist. LEXIS 14935, 2013 WL 434188 (W.D.N.Y. Feb. 4, 2013).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: August 5, 2014
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2007 WL 2815630
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeffrey LIGGINS, Plaintiff,

v.

Douglas PARKER, et al., Defendants.

No. 9:04-CV-0966.  |  Sept. 25, 2007.

**Attorneys and Law Firms**

Jeffrey Liggins, pro se.

Ryan, Smallcombe Law Firm, Claudia A. Ryan, Esq., John F. Moore, Esq., of Counsel, Albany, NY, for the Defendant.

**Opinion**

### ORDER

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed on the 5th day of September, 2007. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The Defendants' motion for summary judgment (Dkt. No. 33) is granted, and the Plaintiff's complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Jeffrey Liggins, who is proceeding *pro se* and *in forma pauperis*, has commenced this inmate civil rights action pursuant to 42 U.S.C. § 1983 against Hamilton County and the County's Sheriff, as well as certain other County employees, complaining of conditions which he endured while confined as a pretrial detainee in the Hamilton County Jail ("HCJ"). Plaintiff's complaint represents a comprehensive, wide-ranging critique of the operations of the defendants' prison facility, with his allegations ranging in severity from the failure of prison guards to wear name tags, tuck in their shirts, lace and polish their shoes, and refrain from the use of foul language and boorish behavior, to defendants' failure to provide him with adequate medical care and interference with his access to the attorneys representing him and the courts. In light of the treatment which he received over the nine month period during which he was incarcerated at the HCJ, described by him as "inhumane", plaintiff seeks recovery of compensatory and punitive damages totaling $6 million.

Currently pending before the court is a motion made on behalf of the defendants in the action seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, both on the merits and based upon qualified immunity. For the reasons set forth below, I recommend that defendants' motion be granted.

### I. BACKGROUND

#### A. The HCJ Generally

Between June 27, 2002 and April 1, 2003, plaintiff was confined within the HCJ as a result of criminal charges originating in the Town of Lake Pleasant, New York located within Hamilton County. Amended Complaint (Dkt. No. 12) ¶ 18; Parker Aff. (Dkt. No. 33-3) ¶ 4; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 21. The HCJ is a six-cell prison facility located in Lake Pleasant, and comprised of four cells on the facility's main floor and two upstairs, with an additional group room located outside of the cells, containing an eating area, a television, and a table. Parker Aff. (Dkt. No. 33-3) ¶¶ 8-9; Defendants' Exhibits (Dkt. No. 35) Exh. 16-A. The HCJ typically houses and co-mingles both sentenced and non-sentenced inmates.

**\*2** Inmates confined within the HCJ are subject to rules and regulations which are reduced to writing and included in a prison rule book. Amended Complaint (Dkt. No. 12) ¶ 23; Parker Aff. (Dkt. No. 33-3) ¶ 10; Defendants' Exhibits (Dkt. No. 34) Exh. 10-A. The facility's rules and regulations were read to the plaintiff on the day of his arrival at the facility by Corrections Officer Robert Krugal, who is named in plaintiff's complaint as defendant "Robe Doe", and plaintiff signed a document acknowledging that this in fact occurred. Parker Aff. (Dkt. No. 33-3) ¶¶ 10-12; Defendants' Exhibits (Dkt.Nos.34-35) Exhs. 10-A, 24; *see also* Amended Complaint (Dkt. No. 12) ¶ 23. Included among the policies and procedures in existence at the HCJ is a grievance book to which all inmates within the facility have access.[1] · [2] Parker Aff. (Dkt. No. 33-3) ¶ 13. Although they appear to have been available to him for review, plaintiff was not provided with a copy of either the facility rule book or the grievance procedure. Amended Complaint (Dkt. No. 12) ¶ 23.

**B.** *Missing Belongings*
In accordance with the policy in existence at the HCJ at the relevant times, each inmate is given a milk crate, which is tagged with the prisoner's name, in which to place clothing. Parker Aff. (Dkt. No. 33-3) ¶ 16. Clothing that does not fit within the milk crate is hung in a closet at the facility. *Id.* This practice was apparently followed with respect to the plaintiff. *Id.*

Shortly after his arrest on June 27, 2002, a relative of the plaintiff delivered dress clothes to the HCJ for his use during court appearances; though later recovered on or about October 9, 2003 from a cabinet outside of another prisoner's cell door, those dress clothes were apparently misplaced for a time. Amended Complaint (Dkt. No. 12) ¶¶ 18, 32. In addition to his missing court clothes, plaintiff also maintains that at one point in October of 2002, prison officials at the HCJ misplaced a tee shirt and a CD, following his return from a brief stay at the Central New York Psychiatric Center in Marcy, New York; those items, however, were discovered in January of 2003 in a trash bag located within a milk crate. Amended Complaint (Dkt. No. 12) ¶ 33.

**C.** *Attorney Access*
One of the central issues raised in plaintiff's complaint concerns communications with attorneys in connection with the pending criminal prosecution against him. There is no specific written policy in existence at the HCJ governing telephonic communication between inmates and their attorneys; as a matter of practice, however, inmates are permitted to call their attorneys of record upon request, subject only to the availability of telephone facilities. Parker Aff. (Dkt. No. 33-3) ¶ 17. In-person legal visitation is a matter governed by a specific policy under which inmates are allowed to receive visits from their attorneys during normal hours of operation, provided that no disruption of the facility's operations results. *Id.* ¶ 18.

**\*3** While acknowledging these policies, plaintiff attributes the failure of his first court appointed lawyer, Sterling Goodspeed, Esq ., to visit him over the summer of 2002 to defendants' actions. Amended Complaint (Dkt. No. 12) ¶ 36. Neither plaintiff's complaint nor his affidavit in opposition to defendants' motion, however, supplies further amplification, nor does the record contain anything tending to corroborate his claim that the lawyer's failure to visit him is properly attributable to defendants' policies or actions.[3]

As a result of his inability to communicate with Attorney Goodspeed, plaintiff retained attorney Richard Bach, Esq., of Utica, New York. Amended Complaint (Dkt. No. 12) ¶¶ 37-39. After announcing during a court appearance in mid-September of 2002 that he had retained that attorney to replace court-appointed lawyer Goodspeed, plaintiff received a letter from Attorney Bach advising that he was unable to represent him and stating, in relevant part, as follows: "In reviewing my upcoming trial schedule-I have determined that I would be unable to represent Jeffrey in the manner which would best serve his legal interest."Defendants' Exhibits (Dkt.Nos.34-35) Exh. 14 at pp. 63, 72-77 and Exh. 20. Though once again offering no specifics or corroborating evidence, plaintiff attributes the withdrawal of Attorney Bach and the return of his retainer to counsel's inability to speak with Liggins by telephone. Amended Complaint (Dkt. No. 12) ¶¶ 37-39.

Following Attorney Bach's withdrawal, the court appointed a second attorney, William Martuscello, Esq., to represent the plaintiff. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 80-81.That attorney represented Liggins in the course of the criminal prosecution against him up until the time of his sentencing. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 10.

**D.** *Monitoring of Telephone Calls*
Plaintiff asserts that while speaking by telephone with attorneys or family members from the jail he could hear

indications that his conversations were being monitored, including clicking sounds and other voices. Amended Complaint (Dkt. No. 12) ¶ 41. In response, defendants assert that pursuant to the policy in effect at the HCJ, prison officials are typically present during, and monitor inmate non-legal telephone conversations, although they are able to hear only the inmate portion of any given conversation. [4] Parker Aff. (Dkt. No. 33-3) ¶¶ 26-27. Plaintiff attributes any clicking or other similar sounds to "technical difficulties" resulting from having only one line into the facility. *See* Defendants' Exhibits (Dkt. No. 34) at pp. 66-67.

### E. *Access to Law Library and Legal Materials*

Another facet of plaintiff's complaint concerns the availability of legal resources at the prison. Plaintiff maintains that the refusal of prison officials to make photocopies of legal documents without charge, the lack of "trained personnel to assist in the preparation of legal documents[,]" and the unavailability of a law library within the facility, impermissibly interferes with the right of inmate court access, in violation of the First Amendment. Amended Complaint (Dkt. No. 12) ¶¶ 44-45; Liggins Aff. (Dkt. No. 39) ¶ 6(p).

 ***4** Because of its small size, the HCJ does not contain a law library, nor does it have a specific written policy concerning library use. Parker Aff. (Dkt. No. 33-3) ¶¶ 49-51. In practice, however, inmates at the facility are afforded the opportunity to request legal materials, which are then retrieved from a law library maintained within the county supervisor's office, a short distance from the jail facility. *Id.* While on occasion plaintiff did apparently request legal materials, and did not always receive the correct books, he was ultimately provided with the requested legal materials. *Id.; see also* Liggins Aff. (Dkt. No. 39) ¶ 6(q), (r) (Dkt. No. 12). It should be noted, moreover, that those requests were made at a time when Liggins was represented by counsel, and thus any failure to provide him with legal materials did not hinder his ability to defend against pending criminal charges. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 95.

### F. *Medical Care and Treatment*

Another major focus of plaintiff's multi-faceted complaint is the medical care and treatment which he received while confined by the defendants within the HCJ. Plaintiff's medical care claim falls into two categories, one addressing his exposure to second hand smoke, or environmental tobacco smoke ("ETS"), and the second related to a chronic back condition which, he maintains, was inadequately addressed by the defendants during his stay there.

### 1. *ETS*

Plaintiff maintains that subsequent to his arrival at the HCJ in June of 2002, he was subjected to second hand smoke at the hands of fellow inmates as well as jail workers. Amended Complaint (Dkt. No. 12) ¶¶ 27-28, 48. According to the plaintiff, not only was smoking not prohibited at the HCJ but in fact inmates' smoking habits were encouraged by jail officials who were known to transport them to local ATM machines to withdraw cash for the purchase of cartons of cigarettes, and to go to the store for inmates on Thursdays and Fridays for the purpose of purchasing cigarettes. *Id.* ¶¶ 47-48.

In January of 2003, as a direct result of plaintiff's complaints regarding exposure to second hand smoke, defendant Parker implemented a smoking ban, applicable to both inmates and employees alike, within the entire inside HCJ facility. [5, 6] Parker Aff. (Dkt. No. 33-3) ¶ 77. In accordance with that ban, which was strictly enforced, neither employees nor inmates were permitted to smoke inside of the facility. *Id.* ¶ 78.

Prior to implementation of the smoking ban, while employees and inmates were permitted to smoke, the plaintiff and other non-smoking inmates were free to move about the facility between 7:00 am and 11:00 pm, in such a way as to avoid anyone smoking. Parker Aff. (Dkt. No. 33-3) ¶ 80. Plaintiff and other inmates were also permitted to open windows to obtain ventilation of smoke.*Id.* ¶ 81.Additionally, in response to his complaints regarding ETS, plaintiff was offered the option of a second floor cell; Liggins, however, refused that proposed transfer. Parker Aff. (Dkt. No. 33-3) ¶ 76.

### 2. *Plaintiff's Back Condition*

 ***5** At the time of his entry into the HCJ, plaintiff had a documented history of a chronic lumbar back condition. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 103-09, 123-24; Eagan Aff. (Dkt. No. 33-4) ¶¶ 2-3; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 17. Records associated with plaintiff's pre-custodial medical treatment reveal that well prior to his incarceration at the HCJ he was diagnosed as suffering from degenerative disc disease and a herniated disc at L5-S1. *Id.*

In light of the size of the facility the HCJ does not employ a physician working at the jail; instead, HCJ inmates in need of medical care are treated by physicians and other medical

personnel employed at the Speculator Primary Care Center or the Nathan Littauer Hospital, both of which apparently are located relatively near the prison facility. Parker Aff. (Dkt. No. 33-3) ¶ 58; Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 130.

Plaintiff initially was seen at the Speculator Health Center for his low back pain on August 9, 2002, at which time he was treated with a muscle relaxant but found to be neurologically intact. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. From that point until August 18, 2002, when plaintiff was taken to the Nathan Littauer Hospital Emergency Room complaining of low back discomfort, though without radicular pain, plaintiff's condition was treated with anti-inflammatory medications, pain medication and/or muscle relaxants on almost a daily basis. *Id.* Notes from that emergency room visit record a history of a herniated disc and pain "on and off" for ten years, with a diagnosis of acute exacerbation of chronic low back strain/spasm, but with no acute disc herniation or neurological problems requiring further specialty care. *Id.; see also* Eagan Aff. (Dkt. No. 33-4) ¶ 5. Following that emergency room visit prison officials at the HCJ continued to treat the plaintiff's condition with anti-inflammatory medications, pain relief medication and/or muscle relaxants on a daily basis. Defendants' Exhibits (Dkt. No. 34) Exh. 15-D.

Plaintiff was next seen by outside medical professionals on September 27, 2002 when he was taken to the Speculator Primary Care Center complaining of shortness of breath, chest pain and back pain experienced after opening a window. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. Plaintiff was taken on that same day to Nathan Littauer Hospital for a chest x-ray and EKG, and was diagnosed as suffering from musculoskeletal pain and was prescribed medication for the pain. *Id.*

Plaintiff was taken to the Speculator Primary Care Center on October 8, 2002, again complaining of back pain. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. On that occasion, plaintiff was diagnosed with acute lumbosacral strain with spasms, and was prescribed various medications. [7] *Id.*

Plaintiff was returned to the Speculator Primary Care Center on March 17, 2003, complaining of worsening pain based upon daily exercise from December of the previous year. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. On that occasion plaintiff was diagnosed as suffering from chronic lumbosacral spine spasm/strain. *Id.* An x-ray of plaintiff's

lumbar spine taken at Nathan Littauer Hospital two days later revealed disc space narrowing at L5-S1, but with no fractures. *Id.* Exh. 15-A. Plaintiff continued receiving muscle relaxers on almost a daily basis between that time and his transfer out of the jail into the Clinton Correctional Facility on April 1, 2003. *Id.* Exh. 15-A, 15-D.

**\*6** At the heart of plaintiff's claims regarding the defendants' treatment of his back condition is his contention that he requested but was denied magnetic resonance imaging ("MRI") testing to determine the cause and the extent of his back pain, and that while x-rays were ultimately taken, as requested, he was not promptly notified of their results. [8],[9] *See* Amended Complaint (Dkt. No. 12) ¶¶ 50-57; Liggins Aff. (Dkt. No. 39) ¶ 6(h)-(o).

In sum, it appears that while incarcerated at the HCJ between June 27, 2002 and April 1, 2003 plaintiff was treated on at least eight separate occasions for that condition by outside sources, and was provided medications on a regular basis to assist him in coping with his pain. It is true, as defendants acknowledge, that on between three and five occasions plaintiff requested to be seen by a doctor for his back pain; those requests, however, were denied on the basis either that they were made on weekends, when there were no deputies available for transport, or at times when snow conditions made travel hazardous. Defendants' Exhibits (Dkt. No. 34) Exh. 6 (Defendants' Responses to Interrogatories) ¶ 3(e)(1) (iii); Exh. 14 at pp. 112, 119;*see also* Amended Complaint (Dkt. No. 12) ¶ 49. The records also disclose, however, that plaintiff declined offers of doctor visits on several occasions including on January 6, 2003. Defendants' Exhibits (Dkt. No. 34) Exh. 10-D and Exh. 14 at pp. 112-13.

### G. *Unprofessional Conduct and Other Miscellaneous Complaints*

Interspersed among the more serious claims set forth in this complaint, as amended, are allegations by the plaintiff of unprofessional conduct and unpleasant conditions experienced by the plaintiff as a result of the defendants' actions. Typical of those are allegations that 1) inmates are not properly overseen when washing and returning dishes for reuse, Amended Complaint (Dkt. No. 12) ¶ 66; 2) on one occasion, at plaintiff's request, prison officials purchased for him bread which later turned out to contain mold, *id.* ¶ 68; 3) dust is allowed to accumulate in the facility, *id.* ¶ 74; 4) there is evidence of insects, mosquitos and mice located within the jail, *id.* ¶¶ 74-77; 5) Liggins was required to use a cup

with dry black stains on the outside when served milk by prison officials, *id.* ¶¶ 83-85; 6) prison administrators failed to properly supervise and monitor inmates, *id.* ¶¶ 87-92; and 7) prison guards were permitted to use inappropriate language, failed to wear proper uniforms or to wear name tags, and were permitted to wear denim jeans, *id.* ¶ 21.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 16, 2004 and, at the direction of the court, filed an amended complaint on September 30, 2004. Dkt. Nos. 1, 8, 12.Named as defendants in plaintiff's complaint, as amended, are Hamilton County; Hamilton County Sheriff Douglas Parker; the Hamilton County Sheriff's Department; and several Hamilton County employees, including Corrections Lieutenant Carl Abrams, and Corrections Officers Robe Doe, Mike Doe and Dan Doe, each of whose last names are unknown to the plaintiff. [10] Plaintiff's complaint asserts various claims under the Eighth and Fourteenth Amendments to the United States Constitution, as well as alleging defendants' violation of state law and regulation associated with the operation of the HCJ. Dkt. No. 12.

**\*7** On September 21, 2006, following the joinder of issue and completion of pretrial discovery, defendants moved seeking summary judgment dismissing plaintiff's complaint in its entirety. Dkt. Nos. 33-35.In their motion, defendants argue that, as a matter of law, plaintiff's claims are deficient on the merits, and additionally assert their entitlement to qualified immunity from suit. *Id.* Plaintiff has since submitted an affidavit and memorandum in opposition to defendants' motion. [11] Dkt. No. 39.With the filing of that opposition and a subsequent reply on behalf of the defendants, filed on January 3, 2007, *see* Dkt. No. 41, this matter is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).*See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."*Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510;*see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [12] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."*Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B.** *Plaintiff's Failure to Provide a Local Rule 7.1(a)(3) Counterstatement of Disputed Facts*

In support of their motion defendants have submitted a comprehensive statement of material facts which, they contend, are not genuinely disputed, as required by Rule 7.1(a)(3) of this court's local rules. [13] *See* Dkt. No. 33-5. Plaintiff's opposing motion papers, however, fail to contain such a statement or to otherwise specifically address the assertions set forth in defendants Local Rule 7.1(a)(3) statement. In their reply, defendants argue that this shortcoming carries with it fatal consequences, establishing their entitlement to the relief sought in their motion. As a threshold procedural matter, I must address the significance, if any, of plaintiff's failure to properly respond to defendants' 7.1(a)(3) statement.

Undeniably, the consequences of plaintiff's failure to properly refute the assertions set forth in defendants' rule 7.1(a)(3) statement are potentially significant. By its express terms, Local Rule 7.1(a)(3) provides that "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L .R. 7.1(a)(3). This and similar rules from other districts are routinely enforced by courts, resulting in facts set forth in such statements being deemed as admitted based upon an opposing party's obligation to respond properly to the statement. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

In this instance, while it is true that the plaintiff is in technical violation of the provisions of Local Rule 7.1(a)(3), he has not totally defaulted in connection with defendants' summary judgment motion, and indeed has clearly articulated in his opposing memorandum and affidavit-albeit in an extremely terse and conclusory fashion-his position concerning each of the factual matters at issue in this case. Accordingly, and in view of his *pro se* status and the reluctance of courts to decide cases on the basis of such procedural shortcomings, *see Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)*, while underscoring the importance of Local Rule 7.1(a)(3) and its utility in ensuring an orderly and reasoned presentation to the court of summary judgment motions, I nonetheless recommend against a wooden application of the rule to deem all matters set forth in the defendants' Local Rule 7.1(a)(3) statement as admitted.

**C.** *Court Access and Access to Counsel*

**\*9** In his complaint, plaintiff asserts that by their actions defendants unlawfully interfered with his access to counsel and the courts. Plaintiff's court access claim is comprised of two distinct components. Plaintiff initially asserts that while confined in the HCJ he was denied access to adequate legal resources, including a law library and photocopying facilities. Additionally, Liggins maintains that prison officials at the HCJ interfered with and hampered communication with the lawyers representing him in the criminal matter which resulted in his confinement.

**1.** *Access to Legal Materials*

The first portion of plaintiff's complaint relates to the alleged insufficiency of the legal materials and resources made available to inmates at the HCJ. Defendants seek summary dismissal of this claim as a matter of law.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. [14] *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977)*. Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law [,]*id. at 828, 97 S.Ct. at 1498,* the Court later clarified that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996)* (internal quotations and citations omitted). Instead, an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."*Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was

being impeded" as a result of defendants' conduct. *Id.* at 352, 116 S.Ct. at 2181. This is a particularly challenging requirement to meet in a case such as this, where the prison inmate asserting the court access denial claim is represented by legal counsel in the civil or criminal matter at issue. *See Santiago v. New York City Dep't of Corr.,* 2003 WL 1563773, at \*6 n .2 (S.D.N.Y. Mar. 6, 2003) (noting that where an inmate is represented by counsel, "there can be no violation of his constitutional right to access to the courts as a matter of law") (quotations omitted) (collecting cases); *see also Smith v. City of New York,* No. 03 Civ. 7576, 2005 WL 1026551, at \* 7 (S.D.N.Y. May 3, 2005).

 **\*10** It should be noted, moreover, that the law does not mandate that every prison facility, however small in size, maintain a physical library for use by inmates. *See Bounds,* 430 U.S. at 830-31, 97 S.Ct. at 1499. Indeed, courts have approved alternative measures deemed sufficient to afford appropriate legal materials in settings comparable to those now presented. *See, e.g., Holmes v. Buffardi,* No. 9:01-CV-980, Dkt. No. 17 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd,* Dkt. No. 19 (N.D.N.Y. June 10, 2002) (Kahn, J.); (approving of the provision of legal materials through use of a CD Rom system); *Torres v. Buffardi,* No. 9:01-CV-1599, Dkt. No. 12 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd,* Dkt. No. 13 (N.D.N.Y. June 12, 2002) (Kahn, J.) (approving of the provision of legal materials through use of a CD Rom system).

As a small, six-cell facility, the HCJ does not include a law library. Parker Aff. (Dkt. No. 33-3) ¶¶ 8, 49-53. Instead, inmates are informed that upon request prison officials will retrieve law books and legal materials from the local county supervisor's office, which is within walking distance from the jail, and provide them to inmates. *Id.* ¶¶ 50-51. According to Sheriff Parker, each time the plaintiff requested legal materials, they were provided through this mechanism. [15] *Id.* ¶ 52. Such an alternative measure to maintaining a complete library for a six-cell prison facility suffices to satisfy the constitutional court access mandate, and no reasonable factfinder could conclude otherwise. *See, e.g., Saucedo v. Enders,* No. Civ. EP03CA433, 2004 WL 911309, at \*2 (W.D.Tex. Apr. 16, 2004) ("[A]ccess to the courts may be satisfied either by availability of legal materials, by counsel, or by any other appropriate device of the State; ... [the] alternatives open to the State are legion.") (quoting *Cruz v. Hauck,* 515 F.2d 322, 331 (5th Cir.1975)).

In addition to failing to establish a deprivation of constitutional significance resulting from the lack of a prison library at the HCJ, plaintiff has also failed to establish that he suffered prejudice as a result of that shortcoming. It is well-established that a necessary component of a court access deprivation claim under the First Amendment is the showing of actual injury sustained as a direct consequence of the deprivation. *Lewis,* 518 U.S. at 351-53, 116 S.Ct. at 2180-81; *Monsky v. Moraghan,* 127 F.3d 243, 246-47 (2d Cir.1997) (citing *Lewis* ), *cert. denied,* 525 U.S. 823, 119 S.Ct. 66 (1998). As was previously discussed, to sustain a First Amendment court access claim a plaintiff must prove that he or she was hindered in the pursuit of a nonfrivolous legal claim as a result of the alleged constitutional violations. *Lewis,* 518 U.S. at 351-55, 116 S.Ct. at 2180-81; *see also Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998). In this instance, plaintiff has not established the existence of any such injury. Unlike plaintiffs in many First Amendment court access claims arising under 42 U.S.C. § 1983, the plaintiff in this instance was represented by counsel at all stages of the criminal prosecution against him. Plaintiff's bare, conclusory allegation that because of defendants' actions he was ill-prepared to enter a plea and for sentencing are wholly unavailing to establish a cognizable injury resulting from the alleged First Amendment violation.

### 2. *Interference With Communications With Attorneys*

 **\*11** The second aspect of plaintiff's court interference claim arises from limitations allegedly placed by the defendants on his ability to select and communicate with an attorney to represent him in connection with the pending criminal proceedings. *See* Amended Complaint (Dkt. No. 12) ¶¶ 35-41. "[T]he right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts." *Benjamin v. Fraser,* 264 F.3d 175, 186 (2d Cir.2001). The Second Circuit has determined that, in cases involving a pretrial detainee's right to utilize counsel in his defense, both the due process right of access to the courts and the Sixth Amendment right to counsel are implicated. *Id.* at 187 (considering whether prison restrictions on pretrial detainees' visits with their attorneys violated the detainees' rights to counsel and of access to the courts). Where a plaintiff contests his or her access to counsel as a pretrial detainee, the court must consider whether the challenged prison conduct " 'unjustifiably obstruct[s] the availability of professional representation or other aspects of the right of access to the courts' " in light of " 'the central objective of prison administration, safeguarding institutional security.' " *Id.* at 187 (quoting *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1974 (1989)

and *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878 (1979)); *see also Elmaghraby v. Ashcroft,* No. 04 CV 1409, 2005 WL 2375202, at *22 (E.D.N.Y. Sept. 27, 2005), *affirmed in part, reversed in part, remanded by Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007).

In the instant case, plaintiff alleges that once he determined to retain counsel in order to replace his court appointed lawyer, he was provided with an antiquated, out-of-date version of the telephone book yellow page business entries. *See* Amended Complaint (Dkt. No. 12) ¶ 37. During his deposition, however, plaintiff acknowledged that a short time later he was provided with a more current version, and that he did not have any court appearances during the intervening time period while he was awaiting an updated telephone book. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 59-61.Defendants' exhibits, moreover, including logs of telephone contacts, reveal that plaintiff was able to communicate on several occasions with his newly retained attorney, Richard Bach, Esq., who while initially agreeing to represent him later declined the role and returned plaintiff's retainer to him. Defendants' Exhibits (Dkt.Nos.34-35) Exh. 14 at pp. 63, 72-77 and Exh. 20. By the time of his plea and subsequent sentencing, Liggins was represented by yet another assigned counsel, William Martuscello. The record thus discloses no unjustifiable obstruction by prison officials of Liggins' ability to communicate with his lawyers. Plaintiff's access claim arising from alleged interference with communications with his lawyers is therefore subject to dismissal as a matter of law. [16] *See, e.g., Beyah v. Putman,* 885 F.Supp.2d 371, 374075 (N.D.N.Y.1995) (Baer, J.) (rejecting pretrial detainee's claims that the limitation of his telephone privileges violated his right to access the courts and his right to legal counsel where detainee conceded he was permitted to call his counsel and stated only that his personal calls were restricted).

**D.** *Prison Conditions*

*12 At the heart of plaintiff's diverse and amalgamated claims is his complaint regarding the conditions to which he was exposed during the period of incarceration at the HCJ. [17] Plaintiff asserts that those conditions, when considered in their totality, resulted in a deprivation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process

Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003). Under the Due Process Clause, government officials may subject a pretrial detainee to restrictions inherent to confinement in a detention facility so long as the resulting conditions do not "amount to punishment of the detainee."*Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872 (1979)."Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense[.]"*Id.* at 537, 99 S.Ct. at 1873. As the court noted in *Benjamin v. Fraser,* however, "because this punitiveness inquiry focuses principally on the *purpose* of an imposed disability, it is of limited utility when evaluating the environmental challenges to prison conditions at issue in this case, which ... were not affirmatively imposed."343 F.3d at 50 (emphasis in original).

In *Benjamin,* the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime.*Id.* at 50-51.In light of those considerations, the court held that "although a pretrial inmate mounting a constitutional challenge to environmental conditions must show deliberate indifference, it may generally be presumed from an absence of reasonable care"; according to the Second Circuit, an inmate who challenges prison conditions like the ones at issue in *Benjamin* and in the instant case need not "show anything more than actual or imminent substantial harm."*Id.*

**1.** *Deliberate Medical Indifference*

A portion of plaintiff's complaint addresses the medical care provided to him and other inmates at the HCJ. Plaintiff complains, for example, of the fact there is no physician actually present and on staff at the jail facility. *See, e.g.,* Amended Complaint (Dkt. No. 12) ¶ 49. Plaintiff also challenges the medical care provided for his back condition, and specifically the failure of prison officials to arrange for MRI testing despite requests for such testing by him on several occasions. *Id.* ¶¶ 50-57.

In contrast to the well-established body of jurisprudence addressing deliberate medical indifference claims of sentenced prisoners under the Eighth Amendment, there is both a dearth of case law and significant uncertainty

surrounding the precise standard to be applied to such claims brought by pretrial detainees. That such claims are subject to analysis under the Due Process Clause of the Fourteenth Amendment is clear. *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991). The precise contours of the medical care obligation imposed under the Due Process Clause with respect to pretrial detainees, however, have not been firmly defined by either the Second Circuit or the Supreme Court. *See Pressley v. Green,* No. 02 CIV. 5261, 2004 WL 2978279, at *3 (S.D.N.Y. Dec. 21, 2004). Since the Second Circuit has seemingly endorsed, at least implicitly, application of the Eighth Amendment's analysis to such claims, *id.; see also Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (applying the Due Process Clause of the Fifth Amendment to a deliberate indifference claim brought by a federal pretrial detainee, and noting that "[w]e have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment") (citations omitted), I will look to the now-familiar medical indifference Eighth Amendment standards for guidance.

**\*13** The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."*Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive

risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

### a) *Serious Medical Need*
In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324),*cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*14** In their motion defendants invite the court to conclude, as a matter of law, that plaintiff's back condition does not constitute a sufficiently serious condition to rise to a level of constitutional significance. In support of this assertion defendants offer the expert opinion of Dr. Thomas Stanford Eagan, a practicing orthopedic surgeon. *See generally,* Eagan Aff. (Dkt. No. 33-4). Based upon his review of plaintiff's medical records Dr. Eagan has opined, *inter alia,* that the progression of the protrusion of plaintiff's L5-S1 disc, identified as a condition which preexisted his incarceration at the HCJ, did not occur during the time of his incarceration there. *Id.* ¶ 11.Dr. Eagan therefore concludes that "the worsening of plaintiff's back condition had no relationship to his confinement at the Hamilton County facility or to the

treatment that the plaintiff received while confined at the Hamilton County Jail."*Id.* ¶ 12.

In his response to defendants' motion, plaintiff has asserted that his back condition was "exacerbated" during his incarceration and that his conditions worsened during that time period. *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(h), (j). In light of this assertion and the pain which he claims to have experienced while at the HCJ due to his back condition, however skeptical I may be that a reasonable factfinder will ultimately agree with the plaintiff on this score, I am unable to say as a matter of law that plaintiff's back condition was not capable of causing a sufficient level of pain or degenerating to such a degree as to constitute a serious medical condition to trigger the protections of the Eighth Amendment.

### b) *Defendants' Indifference*

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment.*Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,*970 F.2d 896 (2d Cir.), *cert. denied,*506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

 *15 The record in this case reflects that defendants' efforts to address plaintiff's medical needs far exceeded anything tantamount to indifference. While having no medical personnel on staff at the facility, defendants treated the medical needs of the plaintiff and other inmates by utilizing resources available at nearby medical facilities,

including the Speculator Primary Care Center and Nathan Littauer Hospital. Parker Aff. (Dkt. No. 33-3) ¶ 58.

A review of the relevant medical records reveals that plaintiff was provided care at those facilities on several occasions, and that he was provided or offered medication, including pain relievers and muscle relaxants, on a frequent basis. In the opinion of Dr. Eagan, based upon his review of the plaintiff's medical records, not only was defendants' care and treatment of the plaintiff not indifferent, but indeed during the time of his incarceration at the HCJ it comported fully with generally accepted standards in the medical community. *See* Eagan Aff. (Dkt. No. 33-4) ¶ 16.

It is true that despite plaintiff's requests during the period of his incarceration that he be provided with MRI testing, no such testing occurred during that period. Based upon his review of plaintiff's medical records, Dr. Eagan found no basis to conclude that the failure to provide an MRI represented a departure from the level of care ordinarily anticipated within the medical community. Eagan Aff. (Dkt. No. 33-4) ¶ 16. In his affidavit, Dr. Eagan also noted that the MRI testing conducted on May 19, 2001-some six weeks after plaintiff's transfer out of the HCJ-showed a paracentral disc extrusion on the right L5-S1 with no evidence of any neural-compression, and did not reveal the existence of neurological problems which would require further evaluation by an orthopedic or a neurosurgical specialist. *Id.* ¶ 14.At best, then, plaintiff's complaints regarding the failure to conduct MRI testing represent a classic disagreement by him with forms of treatment offered for his chronic back condition, and do not rise to a level of constitutional significance.*Rodriguez v. Yin,* 328 F.Supp.2d 414, 416-17 (W.D.N.Y.2004).

In sum, based upon the record now before the court, no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs. *See Rodriguez,* 328 F.Supp. at 416-17. Accordingly, I recommend the dismissal of plaintiff's medical indifference claims.

### 2. *Exposure to Second-Hand Smoke*

In another portion of his complaint implicating the Fourteenth Amendment, plaintiff also complains of exposure to second hand smoke, or environmental tobacco smoke ("ETS"), while incarcerated at the HCJ. Amended Complaint (Dkt. No. 12) ¶¶ 47-48. Plaintiff's complaints in this regard are premised upon his allegation that corrections officers and other inmates were

freely permitted to smoke near prisoners, including within the jail, during the period of his confinement. *See id.*

**\*16** In addressing plaintiff's ETS claims, which because of his status as a pretrial detainee arise under the Fourteenth Amendment, I have again drawn upon a well-established body of Eighth Amendment jurisprudence which differentiates between claims alleging present harm due to ETS exposure, and those complaining of future harm caused by exposure to second hand smoke. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *Henderson v. Sheahan,* 196 F.3d 839, 845-47 (7th Cir.1999), *cert. denied,*530 U.S. 1244, 120 S.Ct. 2691 (2000); *Oliver v. Deen,* 77 F.3d 156, 159-60 (7th Cir.1996); *Goffman v. Gross,* 59 F.3d 668, 672 (7th Cir.1995); *McPherson v. Coombe,* 29 F.Supp.2d 141, 145 (W .D.N.Y.1998); *see also, e.g., Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999).

### a) *Present Injury*

Like other Eighth Amendment claims of deliberate indifference to medical needs, plaintiff's claim of ETS exposure endangering his existing health is governed by *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976).*Alvarado,* 267 F.3d at 651;*see also Davidson v. Coughlin,* 920 F.Supp. 305, 309 (N.D.N.Y.1996) (McAvoy, C.J.). To state a claim under the objective prong of the *Farmer* test for present injury caused by ETS exposure, a plaintiff must show that ETS caused him or her to suffer serious adverse health consequences.[18] *Henderson,* 196 F.3d at 845. A serious medical need or injury is one that a physician has diagnosed as requiring treatment, which is so obvious that even a lay person would recognize the need for treatment.*Id.* at 846.

In this instance plaintiff does not seriously assert any present injury suffered by virtue of his exposure to ETS, nor do any records now before the court reflect the existence of such a reaction. While it is true that according to plaintiff's medical records he complained of shortness of breath attributed by him to exposure to ETS on at least one occasion, on September 27, 2002, when taken for treatment to the Speculator Center, a chest x-ray taken on that date at Nathan Littauer Hospital proved negative, and there is no indication in plaintiff's medical records of any asthma or similar condition which would be directly caused or triggered by his exposure to ETS. Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. Accordingly, defendants are entitled to summary judgment dismissing the portion of plaintiff's ETS exposure claim based upon consideration of present

injury suffered from that exposure. *Contrast, e.g., Gill v. Smith,* 283 F.Supp.2d 763, 769 (N.D.N.Y.2003) (Scullin, C.J.) (summary judgment denied where defendant allegedly smoked in plaintiff's presence despite non-smoking policy and knowledge of plaintiff's asthmatic condition).

### (b) *Future Harm*

Plaintiff's claim based upon future harm caused by exposure to ETS is governed by *Helling v. McKinney,* in which the Supreme Court squarely held that deliberately indifferent exposure of an inmate to levels of ETS which poses an unreasonable risk of serious damage to future health can run afoul of the Eighth Amendment's proscription on cruel and unusual punishment. *Id.* at 35, 113 S.Ct. at 2481-82. While distinctly similar to the analysis employed to evaluate claims alleging present harm, objective analysis of allegations of future harm based upon ETS exposure is slightly more complicated, in that it involves two components. As a threshold matter, to prevail on such a claim plaintiff "must show that he [or she] ... is exposed to unreasonably high levels of ETS."509 U.S. at 35, 113 S.Ct. at 2482. Additionally, as the *Helling* Court further explained,

> **\*17** determining whether [plaintiff's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36, 113 S.Ct. at 2482 (emphasis in original).

In light of *Helling* plaintiff has failed to advance allegations of future harm sufficient to satisfy the objective prong of the ETS exposure test. While Liggins has alleged that he was exposed to ETS while at the HCJ, he has submitted nothing concrete to establish that such circumstances could result in harm to him; simply stated, plaintiff has failed

to describe conditions which rise to a level which today's society chooses not to tolerate. *See LaCroix v. Williams,* No. 97-CV-0790, 2000 WL 1375737, at *2-3 (W.D.N.Y. Sept. 21, 2000) (no serious injury when plaintiff merely alleged residence in a smoking dormitory and there was no objective medical evidence showing that plaintiff's symptoms were caused by exposure to ETS). As the District of Columbia Circuit observed in *Scott v. District of Columbia, Helling* does not mandate smoke-free prisons. 139 F.3d 940, 942 (D.C.Cir.), *cert. denied sub nom., Dawson v. District of Columbia,* 525 U.S. 851, 119 S.Ct. 125 (1998). Accordingly, plaintiff's Eighth Amendment claims of exposure to ETS based upon a future harm theory lacks merit.

### 4. *Miscellaneous Prison Conditions*

In addition to the claims already discussed, plaintiff's complaint contains a litany of grievances regarding the conditions to which he was exposed while confined in the HCJ. Plaintiff complains, for example, of suffering verbal harassment at the hands of certain of the defendants, and of Sheriff Parker permitting such conduct. *See, e.g.,* Amended Complaint (Dkt. No. 12) ¶ 21; Liggins Aff. (Dkt. No. 39) ¶ 6(bb). Such allegations, however, are insufficient to establish a constitutional violation since, regardless of how boorish and reprehensible such conduct may appear, verbal harassment of inmates by prison officials generally does not arise to a level of constitutional significance. *Chabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003).

In his complaint plaintiff also challenges the defendants' failure to establish a meaningful grievance procedure through which he and other inmates could seek redress of constitutional violations. While the lack of such a procedure, or defendants' failure to properly administer it, might well provide a basis for excusing the plaintiff's failure to exhaust available administrative remedies as required under 42 U.S.C. § 1997e(a), *see Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan. 31, 2007), it does not independently establish a constitutional violation. [19] "Grievance procedures are the internal procedures and requirements of [prison officials], and, as such prison inmates [do not] have a constitutionally protected right to a grievance procedure...." *Faison v. Hash,* No. 03-CV-6475P, 2004 WL 944523, at *3 (W.D.N.Y. Apr. 23, 2004) (citations omitted); *see also Adams v. Rice,* 40 F .3d 72, 75 (4th Cir.1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such

procedure voluntarily established by a state."). The plaintiff's allegations regarding the lack of a meaningful grievance procedure thus do not rise to a level of constitutional significance.

**\*18** Plaintiff next complains regarding unsanitary conditions and practices at the HCJ, and in particular in connection with the preparation and service of food within the HCJ. In his complaint and supporting affidavit, for example, plaintiff asserts claims associated with the food served to him while at the HCJ alleging, *inter alia,* that he "was served food with hair in it", was "served from an ink stained cup on several occasions" and that "eating utensils were unclean." *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(kk), (mm), (nn); *see also* Amended Complaint (Dkt. No. 12) ¶¶ 66-72. Defendants contest the sufficiency of plaintiff's allegations, both as lacking in factual support and, even if true, failing to rise to a level of constitutional significance.

Undeniably, the Eighth Amendment's prohibition of cruel and unusual punishment extends to the food provided to prison inmates. While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see, e.g., Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001), it does require that prisoners be given "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."*Ramos v. Lamm,* 639 F.2d 559, 570-71 (10th Cir.1980) (citations omitted), *cert. denied,*450 U.S. 1041, 101 S.Ct. 1759 (1981); *see also Robles v.. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citing *Lamm* ); *Cunningham v. Jones,* 567 F.2d 653, 659-60 (6th Cir.1977).

In their motion defendants assert that the food served to inmates within the HCJ is prepared by qualified and experienced individuals, with significant oversight by the New York State Department of Health. Parker Aff. (Dkt. No. 33-3) ¶¶ 30-31. Sheriff Parker's affidavit lists the identity and qualifications of the four individuals principally involved in food handling at the facility. Sheriff Parker also specifically addresses plaintiff's claims regarding a stained cup, explaining in his affidavit that an investigation into plaintiff's claims of discoloration of the beverage cup, attributed by Liggins to ink stains, revealed that the discoloration was due to exposure to hot temperatures in the facility dishwasher. *See* Parker Aff. (Dkt.33-3) ¶ 38; *see also* Defendants' Exhibits (Dkt. No. 34) Exh. 10-C.

Plaintiff's complaint and affidavit in opposition to defendants' motion are comprised largely of conclusory allegations regarding the food and unsanitary conditions under which it is served, without evidentiary support or a great deal of specifics. By contrast, in their motion defendants have provided substantial, detailed information regarding the food service practices at the facility and the standards under which it operates. Since nothing in plaintiff's submissions reveals the existence of any condition associated with the preparation or service of food which would present immediate danger to the health and well-being of inmates at the HCJ, I conclude that no reasonable factfinder could find in plaintiff's favor on his Eighth Amendment claims associated with food service.

**\*19** The balance of plaintiff's prison condition claims relate to minor matters, none of which, either singly or in combination, rise to a level sufficient to support a constitutional claim. Plaintiff alleges, for example, that his civilian clothes and property were misplaced on two occasions. The record reveals, however, that in both instances the missing items were ultimately located, and no evidence has been adduced to reflect that their temporary misplacement was the result of intentional acts on the part of any of the defendants. [20] In any event plaintiff's claim for loss of property does not lie in this instance in light of the fact that the State of New York provides inmates with a remedy under section 9 of the New York Court of Claims Act associated with such property losses. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203-04 (1983); *Gadson v. Goord,* No. 96 Civ. 7544, 1997 WL 714878, at \*7 (S.D.N.Y. Nov. 17,1997).

Plaintiff also apparently complains of the fact that while at the HCJ he was not provided with an outside exercise area. *See* Liggins Aff. (Dkt. No. 39) ¶ 6(c). Without question, prison officials must afford at least some opportunity for exercise to prison inmates under the Eighth Amendment; consequently, the Due Process Clause of the Fourteenth Amendment, at a minimum, requires that some opportunity be provided. *See Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985). Cases addressing this requirement do not, however, set forth specific parameters associated with this requirement, instead leaving such matters to the sound discretion of prison officials. *See id.; see also Davidson v. Coughlin,* 968 F.Supp. 121, 130 (S.D.N.Y.1997). In determining whether a plaintiff's right to exercise has been abridged, courts generally look to a number of factors, including (1) the duration of the deprivation, (2) the extent of the deprivation, (3) the availability of other out-of-cell activities, (4) the opportunity for in-cell exercise, and (5) the justification for the deprivation. *Davidson,* 968 F.Supp. at 130 (citations omitted). The provision of an hour of exercise daily to prison inmates has been found to satisfy the minimum threshold requirement under the Eighth Amendment.*Anderson,* 757 F.2d at 35.

In this instance plaintiff was permitted to remain outside of his cell and was freely allowed access to the entire jail facility each day between the hours of 7:00 am and 11:00 pm. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 132-34; Parker Aff. (Dkt. No. 33-3) ¶¶ 14-15. While it is true that inmates at the HCJ are not provided with an outdoor exercise area, in light of practical constraints, they are free to exercise both in their cells and anywhere else in the jail facility during the sixteen hours that they were permitted to remain outside of their cells. Accordingly, I find that no reasonable factfinder could conclude that plaintiff's Eighth Amendment rights were violated in this regard.

**\*20** Plaintiff also complains of the failure of the defendants in several respects to comply with regulations governing the operation of county jails and penitentiaries, codified at 9 N.Y.C.R.R. §§ 7000-7103. The violation of a state law regulation, standing alone, however, does not arise to a level of constitutional significance actionable under section 1983. *See Ali v. Timmons,* No. 04-CV-0164, 2004 WL 1698445, at \*3 (W.D.N.Y. July 26, 2004) (citing *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,*484 U.S. 896, 108 S.Ct. 229 (1987)).

In sum, while plainly not portraying conditions which could be described as exceedingly pleasant, none of plaintiff's allegations describe circumstances from which a reasonable factfinder could discern the existence of actual or imminent substantial harm sufficient to establish the violation of the Due Process Clause of the Fourteenth Amendment. I therefore recommend the entry of summary judgment dismissing plaintiff's prison condition claims as a matter of law.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint, which recounts varied grievances regarding his nine month detention within the HCJ, includes an amalgamation of claims principally implicating his right to substantive Due Process under the Fourteenth Amendment United States Constitution. The HCJ, as portrayed by the plaintiff, is anything but a model prison. It may well be that with judicial oversight, many of the practices of which Liggins has complained could be rectified. The Supreme

Court long ago sagely counseled against such judicial intervention, however, in its decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861 (1979), observing that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions", falling within the ambit and expertise of corrections officials and requiring that "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."*Bell,* 441 U.S. at 547, 99 S.Ct. at 1878 (citations omitted). For these reasons the Supreme Court has urged courts to resist the impulse to become "enmeshed in the minutiae of prison operations", noting that

> under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

**\*21** *Id.* at 562, 99 S.Ct. at 1886.

Based upon a careful review of the record before the court, considered in a light most favorable to him, I find that none of the matters complained of rise to a level of constitutional significance and could lead to a finding by a reasonable factfinder that plaintiff's constitutional rights have been violated. [21] Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 33) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Footnotes

1    Plaintiff disputes the availability of a functional grievance procedure at the facility. *See* Amended Complaint (Dkt. No. 12) ¶ 15 ("[t]here is no prison grievance procedure at the [HCJ]"); Liggins Aff. (Dkt. No. 39) ¶ 6(gg) ("[i]ntake made mention of a grievance book however I was never permitted to use this procedure").

2    While Sheriff Parker indicates that the grievance book is attached to as Exhibit 16 to the affidavit of defendants' counsel, that procedure manual does not accompany Exhibit 16 as filed with the court and I have been unable to locate it among the voluminous materials submitted by defendants in conjunction with their motion.

3    In their motion, defendants note that plaintiff was able to confer by telephone with Attorney Goodspeed following his initial booking into the HCJ, and that he was always permitted by prison officials to speak with Attorney Goodspeed by telephone or to receive his visits. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 44-45, 136 and Exh. 16-B. A log maintained at the HCJ reflects several telephone conversations between the plaintiff and Attorney Goodspeed, as well as calls made by the plaintiff to other attorneys during the time that Goodspeed acted as his counsel of record. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 16-B.

4    Significantly, that policy did not apply to inmate conversation with attorneys, which remained private and confidential. Parker Aff. (Dkt. No. 33-3) ¶ 28.

5    According to the plaintiff, there was a no-smoking policy in effect at the HCJ at the time of his arrival in June of 2002, although it was not enforced until January, 2003. Liggins Aff. (Dkt. No. 39) ¶ 6(d).

6    Shortly after the smoking ban went into effect plaintiff was separated from two inmates who were smokers. Parker Aff. (Dkt. No. 33-3) ¶ 82. That separation was implemented for plaintiff's protection, with defendants fearing the possibility of retaliation against

the plaintiff for implementation of the smoking ban. Parker Aff. (Dkt. No. 33-3) ¶ 82. That separation was short-lived, however, in light of assurances by the plaintiff that he did not fear being harmed as a result of the smoking ban. *Id.* ¶ 83.

7   According to the HCJ medication log, at or about this time plaintiff refused medication offered to him on three separate occasions. Defendants' Exhibits (Dkt. No. 34) Exh. 15-D.

8   Plaintiff's medical records do not substantiate his claim of having requested MRI testing of his back during his stay at the HCJ. *See* Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.

9   According to the plaintiff, shortly after his transfer out of the HCJ he was administered an MRI, revealing a herniated disc, chronic degenerative disc disease of the lumbar region, narrowing of the disc space at L4-L5, and paracentral disc extrusion in contact with a nerve, and was scheduled for an epidural steroid injection. Liggins Aff. (Dkt. No. 39) ¶ 6(o). Defendants' medical expert, Dr. Eagan, confirms that such an MRI was conducted on May 19, 2003, but notes that while there was contact with the S1 nerve there was no displacement of the nerve root, and x-rays taken on June 10, 2003 revealed only mild degenerative disc disease. *See* Eagan Aff. (Dkt. No. 33-4) ¶ 6.

10  While the Hamilton County Court was also named as a defendant in plaintiff's initial complaint, the court sua sponte ordered dismissal of his claims against that entity based upon a routine review of plaintiff's complaint and *in forma pauperis* application. *See* Dkt. No. 5.

11  As will be seen, plaintiff's opposition papers do not include a response to defendants' statement of material facts not in dispute, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3). *See* pp. 20-23, *post.*

12  In their reply papers, defendants argue that in order to avoid summary judgment the plaintiff was not entitled to rest upon the allegations of his complaint, but instead was duty bound to come forward with materials of evidentiary value in order to demonstrate the existence of genuine, triable issues of material fact, citing, *inter alia, Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). *See* Defendants' Reply Memorandum (Dkt. No. 41-2) at 2. This argument, however, overlooks the fact that plaintiff's *pro se* complaint in this action is signed by the plaintiff under penalty of perjury, and consequently represents the functional equivalent of an affidavit, *see Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), thus readily distinguishing this case from the circumstances extant in *Rexnord Holdings.*

13  That rule provides, in relevant part, that

   [a]ny motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established....

   * * *

   The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs....

   N.Y.N.D.L.R. 7.1(a)(3). Plaintiff was reminded of the requirements of this meaningful rule through defendants' attachment to their notice of motion of this court's "Notification Of The Consequences Of Failing To Respond To A Summary Judgment Motion." *See* Dkt. No. 33-6.

14  The right of court access derives from the First Amendment. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2169 (1983). Although plaintiff's complaint does not purport to state a claim under that constitutional provision, in light of his *pro se* status I recommend that the court construe his complaint, as amended, liberally to assert such a cause of action. *See Abbas v. Dixon,* 480 F.3d 636, 638 (2d Cir.2007).

15  In his answering affidavit, submitted in opposition to defendants' motion, Liggins asserts that he requested legal materials on several occasions to assist in the preparation of his defense and to prepare for sentencing but that "[t]he guards failed to provide the correct material." *See* Liggins Aff. (Dkt. No. 39) ¶ 6(r). This statement, however, is at odds with plaintiff's deposition testimony, during which he acknowledged that while on occasion guards would return with the wrong legal materials, he would then be provided with the requested materials a few days later. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 95; *see also* Parker Aff. (Dkt. No. 33-3) ¶ 53. An affidavit given in opposition to a summary judgment motion which conflicts with other sworn statements of the opposing party cannot alone suffice to raise a genuine issue of material fact. *See Reisner v. Gen. Motors,* 671 F.2d 91, 93 (2d Cir.) (disregarding factual claims made in opposition to summary judgment motion which contradicted earlier affidavits, deposition testimony, and interrogatory responses), *cert. denied,* 359 U.S. 858, 103 S.Ct. 130 (1982).

16  One portion of plaintiff's court access claim surrounds his suspicion that defendants were responsible for his sentencing being advanced from the originally scheduled date. *See* Amended Complaint (Dkt. No. 12) ¶¶ 61-62. During his deposition, however, plaintiff acknowledged that his allegations in that regard were the result of sheer surmise as to the defendants' involvement in the establishment of his sentencing date, and the record contains nothing of evidentiary value to substantiate his suspicions in this regard. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 102-03.

17  Many of the claims made by Liggins fail to identify a particular defendant as the party responsible for the constitutional deprivation alleged. Although defendants have not raised this issue in their motion, the lack of a showing of personal involvement on the part

of various defendants could provide a proper basis for dismissal of those claims for which no responsible party has been identified. *See Bass v. Jackson,* 790 F.2d 260, 263. And, while plaintiff appears to assert liability on the part of Sheriff Parker, that liability is plainly based upon his role in overseeing the jail facility and, there being no *respondeat superior* liability under 42 U.S.C. § 1983, *see Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003), his role is in and of itself insufficient to establish his personal involvement in many of the complained of acts. *Id.; see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

18    In certain circumstances, exposure to ETS can also give rise to a cognizable constitutional claim when it has the known effect of aggravating an existing medical condition. *See, e.g., Alvarado,* 267 F.3d at 651 (plaintiff stated Eighth Amendment claim under *Estelle* when he submitted documentation showing that his severe chronic asthma was made worse by ETS).

19    There is considerable question as to whether the plaintiff fulfilled his obligation to exhaust available, internal remedies in order to seek redress of his complaints as required under 42 U.S.C. § 1997e(a) before commencing this action. In their motion defendants have not relied upon this procedural basis to seek dismissal of plaintiff's claims, perhaps owing to plaintiff's allegation that despite the existence of a grievance procedure he "was never permitted to use the procedure."*See* Liggins Aff. (Dkt. No. 39) ¶ 6(gg).

20    As previously noted, personal involvement in a constitutional violation is a prerequisite to a finding of liability under 42 U.S.C. § 1983. *See Wright,* 21 F.3d at 501. Nothing in plaintiff's submissions identifies any of the particular defendants in this case as having been involved in the misplacement of plaintiff's clothes or, for that matter, in most of the incidents complained of, thus providing a independent basis for dismissal of plaintiff's claims. *See Barnes v. Henderson,* 490 F.Supp.2d 313, 318-19 (W.D.N.Y.2007).

21    In light of my recommendation on the merits I have not addressed defendants' additional arguments, including to the effect that plaintiff's failure to establish a physical injury deprives him of the right to recover damages for mental anguish and emotional distress in this action under 42 U.S.C. § 1997e(e), as well as their claim of entitlement to qualified immunity from suit.

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 434188
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Aaron WILLEY, Plaintiff,

v.

Robert KIRKPATRICK, et al., Defendants.

No. 07–CV–6484 (MAT).  |  Feb. 4, 2013.

**Attorneys and Law Firms**

Aaron Willey, Elmira, NY, pro se.

J. Richard Benitez, Nys Attorney General's Office, Rochester, NY, for Defendants.

**Opinion**

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

 **\*1** On October 4, 2007, *pro se* plaintiff Aaron Willey ("Willey" or "Plaintiff") instituted this action pursuant to 42 U.S.C. § 1983 against Defendants, alleging that they violated his constitutional rights while he was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The Complaint alleges that Defendants acted "both individually and in concert," but does not allege any claims against them in their official capacities. The Complaint demands a "declaratory judgment stating that Defendants violated [Plaintiff's] constitutional rights," as well as compensatory and punitive damages. Plaintiff was granted permission to file an amended complaint (Dkt # 60), which is the operative pleading in this action.

Defendants Robert A. Kirkpatrick, M. Monahan, Martin Kearney, Scott Lambert, Taylor Roberts, M. Sztuk, A. Allessandro, M. Overhuff, and Tom Schoellkopf have moved for summary judgment dismissing the complaint pursuant to Federal Rules of Civil Procedure 56. Plaintiff has opposed the motion and renewed his request for the appointment of counsel.

For the reasons discussed herein, Defendants' motion for summary judgment is granted, and the amended complaint is dismissed.

**II. Background**

**A. The Parties**

At all relevant times, Plaintiff was housed at Wende Correctional Facility ("Wende"), and Defendants were all employed at Wende. Specifically, Robert Kirkpatrick ("Supt.Kirkpatrick") was Superintendent at Wende; M. Monahan ("DSS Monahan") was Deputy Superintendent for Security; Martin Kearney ("Capt.Kearney") was a Corrections Captain; Scott Lambert ("Sgt.Lambert") and Jeff Jeziorski ("Sgt.Jeziorski") were Corrections Sergeants; Taylor Roberts ("C.O.Roberts"), M. Sztuk ("Sztuk"), A. Allesandro ("C .O. Allesandro"), and M. Overhuff ("C.O.Overhuff") were Corrections Officers; and Tom Schoellkopf ("H.O.Schoellkopf") was a Hearing Officer.

**B. Factual Summary**

The recitation of facts below is drawn from the pleadings and discovery documents on file in this matter. The Court has viewed the facts in the light most favorable to Plaintiff, as the party opposing summary judgment. *See, e.g., United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party.).

**1. The October 2005 False Misbehavior Report for Possessing a Weapon**

On October 15, 2005, Sgt. Lambert and C.O. Roberts detained Willey and frisked him for no apparent reason. They brought him to a small room without a surveillance camera and questioned him about an inmate they suspected of smuggling contraband into Wende. Sgt. Lambert opened a desk drawer and pulled out what appeared to be a metal weapon and said that if he did not work with them as an informant, they would falsely charge him with possessing a weapon. Plaintiff refused to cooperate, stating that he did not have any knowledge of the alleged smuggling. Sgt. Lambert responded, "Have it your way," and brought Willey back to his cell.

**\*2** On October 17, 2005, while Willey was undergoing a pat-frisk before attending yard recreation, C.O. Roberts allegedly uncovered a flat piece of metal about four inches long and three-quarters of an inch wide secreted near his crotch area. C.O. Roberts issued a disciplinary report charging Plaintiff with Possession of a Weapon and Possession of Contraband (PR 110.13 and 110.23). Willey was subsequently found guilty at a disciplinary hearing, even though he was not given notice or an opportunity to appear at the hearing.

On appeal, the conviction was set aside and a new hearing was ordered. At the hearing before Capt. Kearney on December 28, 2005, Plaintiff alleges that he was denied the right to call inmate witnesses and was unjustly removed from the hearing. He states that Capt. Kearney threatened to "beat the shit out of" him and called him a "young punk." According to Capt. Kearney, Willey's removal from the hearing was warranted because he refused to stop interrupting Capt. Kearney and attempting to place irrelevant matters on the record. Capt. Kearney found Willey guilty of both charges, and imposed 180 days in the Special Housing Unit ("SHU"), 180 days of lost privileges, and 12 months recommended loss of good time credits. On appeal, the conviction was set aside by Special Housing Unit Director Donald Selsky ("SHU Director Selsky") on February 28, 2006. [1]

**2. The November 2005 False Misbehavior Report**
On November 26, 2005, C.O. Sztuk and C.O. Allessandro escorted Willey to the shower. When Willey returned, he found that his cell had been "trashed"—the toilet had been flooded, and Willey's papers and belongings were strewn about his cell. When Willey asked C.O. Sztuk for a "search contraband slip," Sztuk replied, "You really like fucking with me." Willey responded, "What?" C.O. Sztuk said, "You heard me, keep fucking with me asshole and see what happens."

Inmates housed nearby confirmed that they had seen C.O. Sztuk carrying Willey's legal paperwork out of his cell after the cell search. Willey yelled out and asked to speak to an area supervisor. He was told to "give it a rest," to which he replied that he would not give it a rest because they had stolen his legal paperwork. At that point, C.O. Sztuk said, "What's that, Willey, you said you are going to shit us down (i.e., throw feces and/or urine on corrections officers)?" Willey denied saying anything like that.

Nevertheless, he was moved to the restricted side of the SHU where a Plexiglas shield was placed on his cell. C.O.

Allesandro then turned off the water to Plaintiff's cell, so that he could not flush the toilet. As a result, feces and urine accumulated in the bowl and made the air in the cell noxious. Willey alleges that the area supervisor, Sgt. Jeziorski, failed to properly supervise C.O. Allessandro and C.O. Sztuk.

On or about November 28, 2005, C.O. Sztuk filed a false misbehavior report against Plaintiff, accusing him of threatening to "shit down" staff members. At the subsequent disciplinary hearing on December 7, 2005, before Susan Post (not a defendant in this action), Willey attempted to use videotape evidence to prove that he did not make such threat. However, according to Willey, someone had tampered with the surveillance tape to remove the sound and destroy the picture quality. Willey was found guilty and sentenced to 90 days in the SHU. On appeal, the charge was affirmed by SHU Director Selsky.

**3. The December 2005 False Misbehavior Report**
**\*3** On December 18, 2005, Willey placed the garbage from his evening meal on his feed-up tray to be picked up. However, C.O. Overhuff refused to remove the refuse, and issued another false misbehavior report against Plaintiff for refusing a direct order (namely, to turn in his food tray) in violation of Prison Rule 106.10. According to C.O. Overhuff, he told Willey to hand him tray, and Willey instead began to break his garbage in pieces; C.O. Overhuff reiterated the order, and Willey again allegedly refused.

D.S.S. Monahan placed Willey on a pre-hearing restricted diet, and, on December 20, 2005, denied Willey's appeal of that decision.

At the disciplinary hearing conducted on January 10, 2006, with regard to the December 18, 2005 incident, H.O. Schoellkopf refused to allow Willey to question witnesses and ejected him from the hearing. According to Willey, H.O. Schoellkopf told him, "You are going to die in the SHU, you young punk." H.O. Schoellkopf found Willey guilty and sentenced him to 30 days in the SHU, 30 days of lost privileges and two months of recommended loss of good time credits. On February 28, 2006, the conviction was reversed on appeal by SHU Director Selsky, who found that Willey "was inappropriately removed from the hearing."

**4. Harassment by Corrections Officers and Plaintiff's Suicide Attempt**

Willey states that while he was housed in the SHU, he was subjected to continuous verbal harassment by numerous corrections officers, especially C.O. Allesandro. According to Willey, C.O. Allesandro made sexually harassing comments and, while Willey was showering, would stare at him licking his lips and blowing kisses. As a result, Willey became severely depressed and attempted to overdose on ibuprofen on February 9, 2006. He was taken to Erie County Medical Center and, upon his return to Wende, was placed in an observation cell he describes as filthy and reeking of urine and feces. Willey was left there, naked, for fourteen days. At that point, he was involuntary committed to the Central New York Psychiatric Center, where he stayed for six months.

While there, Willey states that he was attacked by deranged, violent patients; strapped down to a gurney; and injected with potent psychotropic drugs against his will.

After his stint at the Psychiatric Center, he was returned to the Wende SHU.

## 5. The August 2006 False Misbehavior Report

On August 25, 2006, Willey received another misbehavior report for allegedly kicking a corrections officer while he was in restraints on February 10, 2006, the day after his suicide attempt. The issuing officer is not identified in the Complaint.

At the disciplinary hearing, H.O. Schoellkopf found Willey guilty and sentenced him to 180 days in the SHU. On September 17, 2006, Plaintiff wrote to Supt. Kirkpatrick regarding his continuing "false imprisonment" in SHU, claiming that he had done "nothing wrong." Willey also described the history of false misbehavior reports issued against him, beginning on October 15, 2005. Supt. Kirkpatrick responded that based on his review of the "hearing record packet and other related materials," he found "no reason to modify [the] disposition as rendered." Nevertheless, on appeal, SHU Director Selsky reduced the sentence in connection with the August 2006 misbehavior report.

## III. General Legal Principles

### A. Summary Judgment Standard

**\*4** The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)."[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). Where the non-moving party will bear the burden of proof at trial, the movant may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the initial burden has been met by the movant, the non-moving party is required demonstrate that, as to a material fact, a genuine issue exists.FED. R. CIV. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)."A fact is 'material' only if the fact has some effect on the outcome of the suit."*Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998) (citing *Anderson,* 477 U.S. at 248). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson,* 477 U.S. at 248.

The court must draw all reasonable inferences, and resolve all ambiguities, in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."*Hayes v. New York City, Dept. of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citations omitted).

Although a court must read a *pro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that they suggest,"*Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), when alleging a violation of a civil rights statute, even a *pro se* litigant must make "specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."*Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987).

### B. 42 U.S.C. § 1983

To prevail in a Section 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. 42 U.S.C. § 1983; *see also, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).Section 1983 itself, however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."*Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,*512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

**\*5** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The personal involvement of a supervisory defendant may be shown by evidence that, *inter alia,* the "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong ... or ... the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) [2] (citing *Wright,* 21 F.3d at 501 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986))).

## IV. Analysis

### A. Issuance of False Misbehavior Reports in Retaliation For Plaintiff's Refusal to Act as an Informant

The filing of baseless or false charges against an inmate does not, in and of itself, give rise to a constitutional violation. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (An inmate "has no constitutionally guaranteed immunity from being falsely accused of conduct which may result in the deprivation of a protected liberty interest."). Rather, to maintain an actionable claim against correction officers for filing a false misbehavior report, the inmate must be able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right. *See Freeman,* 808 F.2d at 951–53 (reasoning that the filing of false charges is not a constitutional violation, as long as the prisoner is granted a hearing and given an opportunity to rebut the charges); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988) (reversing grant of summary judgment where prisoner claimed that false disciplinary charges were filed against him as retaliation for his cooperation with a state investigation into alleged inmate abuse).

Here, Willey has not alleged that the misbehavior reports were issued in retaliation for his exercise of a constitutionally protected right. However, the Complaint can be construed as alleging that certain defendants issued false misbehavior reports against Plaintiff and that the defendants acting as hearing officers denied him of due process at the related disciplinary hearings. *See* Complaint ¶¶ 19–22, 25–29, 45–48, 55–57, 69–70. In particular, Willey complains that both H.O. Kearney and H.O. Schoellkopf unlawfully ordered him removed from various disciplinary hearings stemming from the false misbehavior reports issued by C.O. Sztuk and C.O. Roberts.

Under New York State regulations, an inmate has the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals."N.Y. COMP.CODES R. & REGS., tit. 7, § 254.6. Although an inmate may bring a successful New York Civil Practice Law and Rules ("C.P.L.R.") Article 78 proceeding pursuant to this regulation, a claim under state law does not necessarily provide a viable due process claim under 42 U.S.C. § 1983.

**\*6** Here, New York has provided inmates with a procedural safeguard at their disciplinary hearings-the right to be personally present-above and beyond that which is required by the federal Constitution. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (ruling that inmates accused of disciplinary violations be afforded certain procedures, including 24—hours notice, the right to call—but not necessarily to be present during the testimony of—witnesses, and an impartial tribunal); *Francis v. Coughlin,* 891 F.2d 43 (2d Cir.1989)."A procedural safeguard does not constitute a liberty interest[.]"*Dawes v. Leonardo,* 885 F.Supp. 375, 378 (N.D.N.Y.1995) (citing *Patterson v. Coughlin,* 761 F.2d 886, 892 (2d Cir.1985) (noting how the court below had "apparently confuse[d] the deprivation of a liberty interest with the denial of the constitutional right to procedural safeguards which is implicated by that interest"), *cert. denied,*474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986))."[W]here that safeguard is not required by the United States Constitution's Due Process Clause, its denial cannot constitute a violation of that clause[.]"*Id.* (citing *Patterson,* 761 F.2d at 892 (finding a section 1983 action permissible where the disciplinary hearing in question violated state procedural requirements simultaneously violated federal due process mandates)). Thus, although it was violative of Willey's state regulatory rights to be excluded from the

hearing, his federal constitutional rights were not violated thereby. Accordingly, his retaliation claim premised on a subsequent federal due process violation must fail. *See, e.g., Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("[A]n inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimum procedural due process protections guaranteed by the Fourteenth Amendment.") (citations omitted).

**B. Destruction of Personal Property**
Willey alleges that C.O. Sztuk and C.O. Allessandro stole legal documents from his cell, and destroyed his personal property (e.g., family photographs and letters). Under *Hudson v. Palmer,* 468 U.S. 517, 536, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), even the intentional destruction of an inmate's property by a prison officer does not violate the Due Process Clause if the state provides that inmate with an adequate post-deprivation remedy. While the loss of property is regrettable, and even though Willey has alleged that these defendants were personally responsible for the loss, he has not stated an actionable constitutional claim because New York state law provides him with an adequate post-deprivation remedy, i.e., § 9 of the Court of Claims Act.*Reyes v. Koehler,* 815 F.Supp. 109, 114 (S.D.N.Y.1993) (citing *Blum v. Koch,* 716 F.Supp. 754, 762 (S.D.N.Y.1989); *Friedman v. Young,* 702 F.Supp. 433, 437 (S.D.N.Y.1988); *DeYoung v. City of New York,* 607 F.Supp. 1040, 1042–43 (S.D.N.Y.1985)); *accord, e.g., Murchison v. Keane,* No. 94 Civ. 466 CSH, 2000 WL 489698, at *6 (S.D.N.Y. Apr.25, 2000) (citations omitted).

**C. Harassment**
*7 Willey alleges that C.O. Allessandro violated his constitutional rights by subjecting him to continuous harassment, which Willey describes as "psychological, emotional, verbal, and sexual." Willey states that C.O. Allessandro would bang on his cell and turn his light switch on and off rapidly. Also, Willey indicates that C.O. Allessandro would stare at him while he was showering and toweling off, and would make sexually suggestive comments. Willey does not claim that C.O. Allessandro physically touched him in a sexual manner, however.

"Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."*Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) (citing *Patton v. Przybylski,* 822 F.2d 697, 700 (7th Cir.1987) (derogatory remarks do not

constitute a constitutional violation); *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987); *Martin v. Sargent,* 780 F.2d 1334, 1338–39 (8th Cir.1985)). Willey has made no showing of uninvited physical or sexual contact, nor has he pled such a cause of action in his Complaint. C.O. Allessandro's annoying conduct and comments, unaccompanied by physical threats or attacks, do not amount to a constitutional violation under § 1983.

**D. Eighth Amendment Violation Based Upon Unsanitary Conditions**
Willey asserts that C.O. Sztuk and C.O. Allessandro violated his Eighth Amendment right to be free from cruel and unusual punishment by turning off the running water to his cell while the Plexiglas cell shield was in place between December 1, 2005, and January 10, 2006. At one point in the Complaint, Willey states that his drinking water and toilet water was shut off for "extensive lengths of time". Compl., ¶ 87 (Dkt # 1). In the next sentence, he states that his toilet water was shut off for "seven (7) days, forcing plaintiff to stay in a plexy glass shield (no air circulation) and breathe in air smelling of urine/feces...."*Id.*

In his response to interrogatories propounded by Willey, C.O. Allessandro denied "purposely shut[ting] [his] toilet [sic] and water pressure off in between" December 1, 2005, and January 10, 2006. Dkt # 95 at 3, ¶ 9. However, Defendants failed to address this conditions-of-confinement claim in their motion for summary judgment.

"While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' " *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)), the conditions of confinement must be at least 'humane,' " *id.*(quoting *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An Eighth Amendment violation based upon living conditions requires the inmate to show (1) a deprivation that is "objectively, sufficiently serious" of "the minimal civilized measure of life's necessities," and (2) a "sufficiently culpable state of mind" on the part of the defendant official, such as deliberate indifference to inmate health or safety. *Gaston,* 249 F.3d at 164 (quoting *Farmer,* 511 U.S. at 834) (internal quotation marks omitted in *Gaston* ).

*8 A Section 1983 claim will not lie for prison conditions that are merely unpleasant,, but chronic exposure to human

waste will give rise to a colorable claim. *See Gaston v. Coughlin,* 249 F.3d 165–66. In *Gaston,* the Second Circuit reinstated an inmate's Eighth Amendment claim against two defendants where the area in front of the inmate's cell "was filled with human feces, urine, and sewage water" for several consecutive days. The Second Circuit stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end."*Id.* at 166.Similarly, in *LaReau v. MacDougall,* 473 F.2d 974, 977–79 (2d Cir.1972), the Second Circuit held that an inmate who spent five days in a cell that contained only a grate-covered hole in the floor for a toilet, which could only be flushed from the outside, was deprived of his Eighth Amendment rights. The circuit court observed that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. The indecent conditions that existed in this ... cell seriously threatened the physical and mental soundness of its unfortunate occupant."*Id.* at 978;*see also Wright v. McMann,* 387 F.2d 519, 522, 526 (2d Cir.1967) (finding 33–day placement of prisoner in strip cell which was "fetid and reeking from the stench of the bodily wastes of previous occupants which ... covered the floor, the sink, and the toilet," combined with other conditions, violated Eighth Amendment).

Courts outside of the Second Circuit have reached the same result where exposure to sewage lasts for a substantial period of time. *See McCord v. Maggio,* 927 F.2d 844, 846–47 (5th Cir.1991) (finding Eighth Amendment violation where inmate lived in cell for two years and slept on floor for months "into which rain water and backed-up sewage leaked"); *Williams v. Adams,* 935 F.2d 960, 961–62 (8th Cir.1991) (reversing grant of summary judgment for prison defendants where plaintiff alleged "that the toilet in the cell did not work" and overflowed continuously "and the floor stay[ed] filthy with its wast[e]" over 13–day period); *Howard v. Adkison,* 887 F.2d 134, 136–38 (8th Cir.1989) (holding Eighth Amendment violation sufficiently proven where inmate lived for two years in cell where walls, door and food slot "were covered with human waste," mattress was "stained with urine and human waste" and pleas for remedial measures went unanswered); *McCray v. Sullivan,* 509 F.2d 1332, 1336 (5th Cir.1975) (finding conditions in isolation cells where inmates lived for as long as 21 days violated Eighth Amendment where waste "frequently" overflowed onto the floors of the cells); *Looper v. Sanders,* Civil No. 6:10–cv–06037, 2011 WL 861714, at *4–*5, *8

(W.D.Ark. Mar.10, 2011) (denying defendants' motion for summary judgment where plaintiff was exposed to raw sewage for over 10 months); *Jones v. Sanders,* No. 08–6035, 2009 WL 2432632, at *7 (W.D.Ark. Aug.7, 2009) (Report and Recommendation) (recommending denial of defendants' motion for summary judgment where plaintiff was exposed to raw sewage for a month and a half).

**\*9** "Where an inmate's exposure to waste lasts for three or four days, the Circuits are split."*Ortiz v. Department of Correction of City of New York,* 2011 WL 2638137 (S.D.N.Y. Apr.29, 2011) (comparing *Smith v. Copeland,* 87 F.3d 265, 269 (8th Cir.1996) (affirming summary judgment for defendants where plaintiff was subjected to an overflowing toilet in his cell for four days), *with McBride v. Deer,* 240 F.3d 1287, 1291–92 (10th Cir.2001) (vacating Rule 12(b)(6) dismissal where plaintiff alleged he was forced to live in "feces-covered cell" for three days); *Sperow v. Melvin,* No. 96–4219, 182 F.3d 922, 1999 WL 450786, at *1-*3 (7th Cir. June 24, 1999) (unpublished opn.) (reversing Rule 12(b)(6) dismissal where inmate "was subjected to appalling conditions" of waste-filled cell "for three full days"); *Young v. Quinlan,* 960 F.2d 351, 355–56, 363–65, (3d Cir.1992), *superceded by statute on other grounds as stated in Ghana v. Holland,* 226 F.3d 175, 184 (3d Cir.2000) (reversing summary judgment for defendants where inmate was moved to "dry cell" without working toilet for 96 hours and forced to urinate and defecate in his cell)).

Especially because Willey has adequately pled maliciously wilful conduct by C.O. Allessandro, rather than mere negligence, the alleged shut-off of the running water to Willey's toilet for several days place this case on the borderline between the levels of discomfort to be expected in prison and unacceptable, inhumane conditions. After reviewing the cases cited above, however, the Court concludes that on the particular facts presented here, Willey's conditions-of-confinement claim cannot withstand summary judgment. First, Willey is vague as to the dates that the alleged shut-off occurred, and has made conflicting allegations about the duration ("extensive lengths of time" versus "seven days" versus the time between December 1, 2005, and January 10, 2006). Second, Willey has not claimed that human waste from his toilet overflowed into his cell. *See Smith v. United States,* No. 9:09–CV–729 (TJM/DRH), 2011 WL 777969 at *2, *11 (N.D.N.Y. Feb.3, 2011) (Report and Recommendation) (recommending denial of summary judgment where inmate alleged that officers "refused to flush the toilet or provide the inmates with toilet paper for two weeks," causing overflow

of human waste to spill onto cell floor and inmate to become "nauseous and lightheaded from the odor"), *adopted by,* 2011 WL 776150 (N.D.N.Y. Mar.1, 2011). Third, Willey has not claimed that he suffered sickness or other ill effects as a result of the malodorous atmosphere caused by the water shut-off. *Contrast with Sperow, supra* (reversing dismissal of complaint where, after three days of exposure to human feces and urine on the walls and floor, pieces of a mattress on the floor caked with feces and urine, and a dozen plastic food trays with decayed food, plaintiff was had a headache, gastrointestinal and respiratory problems, and was feverish and sweating); *Smith, supra* (denying summary judgment where inmate alleged that his exposure to raw sewage from overflowing toilet caused sickness and nauseousness).

### E. Imposition of Restricted Diet in Violation of Eighth Amendment and Due Process

**\*10** Willey asserts that D.S.S. Monahan placed him on a pre-hearing restricted diet for seven days, consisting of a loaf of bread cabbage, in violation of his Eighth Amendment rights. According to Willey, the bread was usually stale and the cabbage usually rotten. Willey also asserts a due process claim in connection with his request to D.S.S. Monahan to rescind the restricted-diet order during the seven days.

#### 1. Eighth Amendment

As stated above, "a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer,* 511 U.S. at 834.

With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983) (citations omitted). For instance, "the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food ... [that does not] present an immediate danger to health and well being of the inmates who consume it." *Id.* at 15 (internal quotation marks and citation omitted). With respect to the second prong, a deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to inflict pain. *See Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002).

Courts in this Circuit routinely have dismissed claims similar to Willey's, finding that the inmate failed to establish that he experienced a sufficiently serious deprivation for purposes of the Eighth Amendment. *See Smith v. Burge,* 2006 WL 2805242, at \*11 (N.D.N.Y. Sept.28, 2006) ("Plaintiff does not establish, or even specifically allege, that (1) the food he was served [i.e., a hard loaf of bread and an apple per day] was nutritionally inadequate (e.g., with respect to the total calories it contained, its grams of carbohydrates, protein, fiber, and fat, or its units of vitamins and minerals, etc.), (2) that he was physically unable to eat the food, or (3) that he lost weight during the week in question.") (footnotes omitted) & *id.,* n. 78 (citing, *inter alia, McEachin v. McGuinnis,* 357 F.3d 197, 199–201 (2d Cir.2004) (affirming district court's F.R.C.P. 12(b)(6) dismissal of Eighth Amendment claim alleging, *inter alia,* that inmate was placed on a restricted diet consisting of "loaf" for seven days)).

#### 2. Procedural Due Process

To pursue a claim under 42 U.S.C. § 1983 that a defendant deprived him of his constitutional right to due process, a plaintiff must show that he "enjoyed a protected interest, and defendant's deprivation of that interest occurred without due process of law." *Taylor v. Rodriguez,* 238 F.3d 188, 191 (2d Cir.2001) (citation omitted). Thus, courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr.,* 490 U.S. at 460.

**\*11** Apparently relying on 7 N.Y.C.R.R. § 304.2, [3] Willey asserts that he was entitled to a hearing before D.S.S. Monahan regarding his request to be removed from the restricted diet prior to the end of the seven-day period.

In order to demonstrate the existence of a liberty interest, the plaintiff must allege facts suggesting that he was subjected to a deprivation that imposed "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Tellier,* 280 F.3d at 80. Willey is hard-pressed to allege or establish such facts given that the Second Circuit has held that the imposition of a restricted diet does not impose an "atypical and significant hardship" on inmates. *McEachin v. McGuinnis,* 357 F.3d at 200–01 (finding that a seven-day post-hearing restricted

diet did not impose an atypical and significant hardship). Indeed, several federal courts "have specifically held that the imposition of a seven-day pre-hearing restricted diet of 'loaf' (imposed without the issuance of a deprivation order or the holding of a hearing during the seven-day period) did not create an atypical and significant hardship for purposes of the Fourteenth Amendment."*Smith v. Burge, supra* at n. 88 (citing *Beckford,* 151 F. Supp .2d at 208–209, 218–219 & n. 4 (not mentioning 7 N.Y.C.R.R. § 304.2, but granting defendants motion for summary judgment as to plaintiff's due process claims because a seven-day pre-hearing restricted diet did not impose an atypical and significant hardship); *Turnboe v. Gundy,* 25 Fed. Appx. 292, 293 (6th Cir.2001) (being placed on a pre-hearing restricted diet consisting of "food loaf" for seven days does not constitute an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life); *Thomas v. Virginia,* 04–CV–0273, 2005 WL 15517, at *10–11 (W.D.Va. July 28, 2005)). The Court finds the analysis in these cases, especially *Smith v. Burge, supra,* persuasive. Accordingly, the Court concludes that Willey has failed to establish a procedural due process claim with respect to the seven-day imposition of a restricted diet prior to his disciplinary hearing.

**V. Conclusion and Orders**

For the foregoing reasons, Defendants' motion for summary judgment is granted, and the Amended Complaint is dismissed. Plaintiff's motion for appointment of counsel, asserted in his opposition to Defendants' summary judgment motion, is denied as moot.

Plaintiff is advised that he must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

**Footnotes**

1    On November 28, 2006, Plaintiff was charged criminally with Promoting Prison Contraband in the First Degree, based upon the false misbehavior report issued by C.O. Roberts in October 2005, regarding Plaintiff's possession of a shank-type weapon. This charge was subsequently dismissed, however, by Alden Town Court Justice LaDuca.

2    In *Colon,* the Second Circuit affirmed summary judgment for Commissioner of DOCCS and the facility superintendent on the grounds that, *inter alia,* the contents of the inmate's letters to them was not in the record and therefore the court did not know "whether the letter was one that reasonably should have prompted [defendants] to investigate."58 F.3d at 873, 874 n. 8.

3    Title 7, Section 304.2 of the New York Code of Rules and Regulations provides, in pertinent part, as follows:

"The superintendent or his designee may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section [which conduct includes refusing to obey a direct order to return a food container at the conclusion of a meal] on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing. The order shall briefly state the reason(s) for the imposition of the restricted diet and contain the following notice to the inmate: 'You may write to the deputy superintendent of security or his/her designee to make a statement as to the need for the continued pre-hearing imposition of the restricted diet.'..."

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.